James Edward **CARLSON** et al.

v.

James R. **SCHLESINGER**, Secretary of Defense, et al., Appellants.

No. 73–2170.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1975.

Decided April 25, 1975.

Rehearing and Rehearing En Banc Denied June 19, 1975.

Robert S. Greenspan, Atty., Dept. of Justice, of the bar of the Supreme Court

of New York, *pro hac vice*, by special leave of Court for appellants. Carla A. Hills, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Robert E. Kopp, Atty., U. S. Dept. of Justice, were on the briefs for appellants. Harold H. Titus, Jr., U. S. Atty., at the time the record was filed, and Michael A. Katz, Asst. U. S. Atty., entered appearances for appellants.

Joel M. Gora, New York City, with whom Melvin L. Wulf, New York City, and David Addlestone, Washington, D. C., were on the brief for appellees.

Before BAZELON, Chief Judge, TAMM, Circuit Judge, and RICHEY,* United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge TAMM.

Dissenting opinion filed by Chief Judge BAZELON.

TAMM, Circuit Judge:

Plaintiffs-appellees James Carlson, Richard Randig, and William Daniels, Jr., former servicemen who were stationed in Vietnam during the period of United States combat operations there, brought suit in district court for declaratory and equitable relief. They alleged: 1) that their arrests for circulating petitions on two Air Force bases in South Vietnam without permission were illegal and should be expunged because the operative Air Force regulations violated the first amendment; 2) that the refusal of their respective commanders to permit

them to solicit signatures infringed upon their first amendment rights; and 3) that the regulations upon which the commanders relied were facially overbroad and unconstitutional. Upon cross-motions for summary judgment, the district court found for appellees. Carlson v. Schlesinger, 364 F.Supp. 626 (D.D.C. 1973). We reverse.

I

The facts of this controversy are fully described in the district court's opinion and need only be summarized here. Appellee Carlson, an enlisted member of the United States Navy, engaged in his challenged activity at Tan Son Nhut Air Base, Vietnam, headquarters of the United States Seventh Air Force, occupied by over 10,000 American service personnel. Tan Son Nhut was heavily fortified and located amidst an area of substantial combat. A. 84–88.

On October 10, 1971 Carlson, off-duty but dressed in uniform, solicited signatures in front of the main post exchange for a petition to Congress expressing opposition to American involvement in the Vietnam war. A. 74.[1] At approximately 3:00 p. m., three Air Force security policemen apparently acting upon an anonymous complaint, arrested Carlson. The petitions were confiscated, and Carlson was taken to the base police station where he was informed that he would be charged with "soliciting signatures for an unauthorized petition"[2] in violation of Air Force Regulation (AFR) 30–1(9).[3] A. 74–75.

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The text of the petition read:
   We, the undersigned American Servicemen on duty in Vietnam, wish to express our opposition to further United States military involvement by air, sea, or land forces in Vietnam, Laos, Cambodia or other countries in South East Asia. We petition the United States Congress to take whatever action necessary to assure an immediate cessation of all hostilities in South East Asia; to set a near date for final and complete military withdrawal; to insure a rapid and peaceful return of American Prisoners of War; and to assume and assert its re-

sponsibility for determination of future American Foreign Policy.
   There followed blank boxes for Name, Rank, Service, and Unit; the petition was signed on the bottom with "Vietnam Veterans Against the War." A. 64.

2. Carlson has stated that one of the policemen informed him that he was suspected of "passing out anti-war material." A. 75.

3. AFR 30–1(9) provides in part:
   Right of Petition. Members of the Air Force, their dependents and civilian employees have the right, in common with all other citizens, to petition the President, the Congress or other public officials. However, the public solicitation or collection of

Several days later, Carlson returned to the base to request permission to solicit signatures; he spoke with the deputy base commander, Colonel Jensen, who orally denied the request. A. 75. Carlson subsequently wrote to the base commander, Colonel Gunn, for authorization, but Colonel Gunn formally denied permission.[4]

Appellees Randig and Daniels were stationed at Cam Ranh Bay Air Base, Vietnam. The base, located on a peninsula, was the duty station of several United States Air Force units and served as a major port of entry and stockpile for ammunition and supplies. A. 93–95. The base had been the target for both enemy rocket and ground attacks. A. 95.

On December 4, 1971, Randig, off-duty and not in uniform, gathered signatures at the Air Force Hospital. A. 78. After phone calls by soldiers objecting to his activity, he was arrested by military police and confined for two hours. The base commander, Colonel Fitzgerald, told Randig that he was charged with "soliciting signatures for an unauthorized petition." Randig was informed that he would not be prosecuted and was released. A. 78.[5]

Five days later, appellees Randig and Daniels addressed a letter to Colonel Fitzgerald seeking authorization to circulate the petition and setting forth a number of restrictions they volunteered to obey. A. 40–41, 69–70. In a written response, the commander denied the request.[6] Thereafter, all three appellees, while still servicemen, instituted a class action for injunctive and declaratory relief.

signatures on a petition by any person within an Air Force facility or by a member when in uniform or when in a foreign country is prohibited unless first authorized by the commander.
*Reference:* AFR 35–15.

**4.** The letter read:

On 17 October 1971 my deputy, Colonel Sigurd L. Jensen, Jr, acting in my absence, considered the application of SK3 Edward Carlson to circulate the petition in question on Tan Son Nhut Air Base. After examining the petition, and considering all of the circumstances, he denied the application to circulate the petition. After careful consideration of your letter of 18 October 1971, I adhere to that determination. A. 68.

Colonel Gunn made an additional explanation in connection with this litigation which stated in part:

I had to consider that we are located in a war zone and, thus, any activity which may affect the morale of the personnel here or interfere with the mission must be closely scrutinized. Considering that when Seaman Carlson was originally soliciting signatures, a complaint, though anonymous, was made to the Security Police, I could not take any chances. I felt I had to deny the request in order that no possible difficulties with morale or discipline would arise within my command. A. 82.

**5.** Apparently no record was kept of Randig's arrest.

**6.** Colonel Fitzgerald's response stated:

Having carefully reviewed, pursuant to paragraph 9, AFR 30–1, your request for permission to solicit signatures on a petition at Cam Ranh Bay Air Base, and having carefully reviewed the contents of the petition, I hereby deny your request. A. 71.

In two affidavits, Colonel Fitzgerald elaborated on his reasoning. In the first, he stated:

It was obvious to me that a clear danger to the loyalty, discipline, and morale of military personnel assigned to this base in the Republic of Vietnam existed from the circulation of a petition urging a precipitous, final withdrawal from our United States commitment. Their solicitation presented a clear danger of material interference with the accomplishment of the military mission in Vietnam by seeking disaffection on the part of military personnel in Vietnam with the effort they were here to support. This was made even more obvious by the fact that the first solicitation came to light as a result of two anonymous phone calls to the Security Police by personnel of the 483rd USAF Hospital who voiced their objection to those petitions in a war zone. A. 91.

In a later affidavit, Colonel Fitzgerald opined:

I . . . had to consider the potential adverse affect on morale of circulating an anti-war petition. To officially permit dissident individuals to circulate a petition which advocated disregard and disrespect for the U.S. mission in Vietnam, would, in my judgment have seriously lowered the morale and status of discipline in the command, jeopardized security, and adversely affected fulfillment of our mission. I was particularly concerned about the probable affect on the approximately 1000 security police who were responsible for guarding

Relying substantially on this court's decision in Avrech v. Secretary of Navy, 155 U.S.App.D.C. 352, 477 F.2d 1237 (1973) before its reversal by the Supreme Court, and before the Court decided Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), the district court, upon cross-motions for summary judgment, found for appellees. The court first held that the case was not moot, as while at that point appellees had left the service, "the constitutional violations complained of are capable of being repeated as long as the challenged regulations remained in force," 364 F.Supp. at 630. The court then held that appellees' arrests violated the first amendment in that AFR 30–1(9) was an impermissible prior restraint because the guiding standards of AFR 35–15 were vague and overbroad and permitted commanders to make arbitrary and capricious determinations. Id. at 632–33. Moreover, the court found an independent infringement of appellees' first amendment rights in that the commanders committed an "abuse of command discretion" in prohibiting solicitation. Id. at 637. Finally, both regulations were found to be unconstitutionally overbroad on their face as an infringement of legitimate first amendment activity. The court ordered the records of appellee Carlson's detention expunged. Id. at 640.

## II

■ Were this case set in a civilian setting, the actions taken by the governmental authorities would run afoul of the first amendment. However, we are undeniably dealing with the military, and the Supreme Court has recently instructed that, "[w]hile the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections." Parker v. Levy, supra, 417 U.S. at 758, 94 S.Ct. at 2563. See also Dash v. Commanding General, 307 F.Supp. 849 (D.S.C.1969), aff'd, 429 F.2d 427 (4th Cir. 1970), cert. denied, 401 U.S. 981, 91 S.Ct. 1192, 28 L.Ed.2d 333 (1971). To strike the proper balance between legitimate military needs and individual liberties we must inquire whether "conditions peculiar to military life" dictate affording different treatment to activity arising in a military context. Kauffman v. Secretary of the Air Force, 135 U.S.App.D.C. 1, 415 F.2d 991, 997 (1969), cert. denied, 396 U.S. 1013, 90 S.Ct. 572, 24 L.Ed.2d 505 (1970).

To approach plaintiffs-appellees' claims properly requires that we separate the two pairs of events in question. Appellees allege two independent infringements of their constitutional rights—their arrest or detention for soliciting signatures without the prior approval required by AFR 30–1(9) and the subsequent refusals of Colonels Gunn and Fitzgerald to grant such approval on the basis of AFR 35–15. Therefore, we must undertake to analyze each event against appropriate constitutional standards.

■■ It is axiomatic that the Government may reasonably regulate the "time, place, and manner" of first amendment activity. See, e. g., Grayned v. City of Rockford, 408 U.S. 104, 115, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Police Department of Chicago v. Mosley, 408 U.S. 92, 98, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); Cox v. New Hampshire, 312 U.S. 569, 575–76, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). Moreover, the greater the government's legitimate interests, the greater must be the government's latitude to prescribe reasonable regulations. Compare Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) with Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). Clearly beyond peradventure,

the base from enemy attack 24 hours a day. . . . Should these security forces have become disenchanted with their overall mission . . . it was obvious to me

that the security of Cam Ranh Bay Air Base would have been directly and seriously jeopardized. A. 98–99.

that governmental interest is manifest in the context of a military combat zone—a condition peculiar to the military which justifies differing treatment. In such a context, we believe the requirement that a serviceman obtain his commander's approval before circulating a petition is eminently reasonable; the exigencies of the combat mission can yield no other result.

▮ Hence, we must conclude that the arrests of the servicemen in this case did not violate the first amendment. The record reveals beyond dispute that both arrests occurred in Vietnam, a combat arena. Appellee Carlson was arrested at Tan Son Nhut Air Base, occupied by tactical and combat troops and the scene itself of enemy rocket, anti-aircraft, and combat attacks. A. 85–88. Similarly, appellee Randig was arrested at Cam Ranh Bay Air Base, also a base for tactical and combat units and one that housed stockpiles of major stores of ammunition. In fact, the base had been directly attacked on several occasions, and the enemy had once succeeded in breaking through base defenses and destroying 75 percent of the stored ammunition. A. 93–96. Moreover, the record is clear that the reasons for the arrests were appellees' failure to obtain prior approval. Carlson himself testified that he was informed that he was charged with "soliciting signatures for an unauthorized petition;" appellee Randig was informed by the base commander of the identical charge the day of his arrest. We hold that AFR 30–1(9) was properly invoked against appellees and that the government's actions in detaining appellees abridged no cognizable first amendment interest.

The second pair of events relate to appellees' inability to obtain permission from the base commanders to circulate their petitions. Both Colonel Fitzgerald and Colonel Gunn denied the request to solicit on the basis of AFR 35–15 which required denial if they determined that "a clear danger to the loyalty, discipline, or morale of members of the Armed Forces, or material interference with the accomplishment of the military mission" would occur. Appellees have asked this court to upset that determination, made in combat zone circumstances, and to find the commanders' refusal to be an unreasonable infringement of first amendment rights.

▮ To make that determination, we must balance, as did the commanding officers, the legitimate combat zone needs of the military with the requested activity. In doing so, we are mindful that the first amendment has "never been thought to give absolute protection . . . to speak whenever or wherever [an individual] chooses." Cohen v. California, 403 U.S. 15, 19, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284 (1971). We must also recognize that the necessity for discipline "may render permissible within the military that which would be constitutionally impermissible outside it." Parker v. Levy, supra, 417 U.S. at 758, 94 S.Ct. at 2563. Further, we acknowledge that the Supreme Court has warned us against assuming the role that appellees advance:

> judges are not given the task of running the Army. The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

Orloff v. Willoughby, 345 U.S. 83, 93–94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953).

▮▮ We conclude that in a combat zone situation, a commanding officer must be afforded substantial latitude in balancing competing military needs and first amendment rights. The Supreme

Court recognized long ago that "[a]n army is not a deliberative body." In re Grimley, 137 U.S. 147, 153, 11 S.Ct. 54, 55, 34 L.Ed. 636 (1890). Because judges are ill-equipped to second guess command decisions made under the difficult circumstances of maintaining morale and discipline in a combat zone,[7] cf. Goldwasser v. Brown, 135 U.S.App.D.C. 222, 417 F.2d 1169, 1177 (1969), we should not upset such determinations unless the military's infringement upon first amendment rights is manifestly unrelated to legitimate military interests. *See* Dash v. Commanding General, *supra.* In the case *sub judice*, we cannot find that this nexus was absent.

The commanders determined that the solicitations of signatures would pose a danger to discipline and morale, and thus withheld permission on the basis of AFR 30–15. *See* notes 4, 6 *supra.* In doing so, they were not using only the facts contained within the four corners of the petition, but were drawing upon their experience as military commanders and upon their position in the field—advantages which we obviously do not possess. Moreover, they were able to gauge the potential reactions to the petitioning by their experiences when appellees attempted previously to solicit signatures without approval. In both cases, other servicemen registered objections to the military police. The inference that further activity would invoke further objections, possibly in a stronger manner, seems manifest. *Cf.* Dash v. Commanding General, *supra.*

We must point out that the commanders' decisions did not eradicate totally the first amendment rights of the servicemen involved. Permission to solicit signatures was denied under authority of a regulation dealing *only* with the

distribution or posting of material. The petition could have been read aloud or its contents discussed at informal group sessions. In fact, each serviceman who signed the petition was perfectly free to communicate the exact sentiments by letter to Congress. This right of petition is protected both by statute, 10 U.S.C. § 1034 (1970), and by Air Force Regulation 30–1(9). What has happened here is that in a combat zone context the military has reasonably regulated the *time* and *manner* of protected first amendment activity.

In sum, after affording their decision due and proper deference, we cannot conclude that the balance struck by the field commanders between military needs and first amendment rights was improper or represented an abuse of discretion. In doing so, we recognize, as did Professor Emerson, that:

> To a certain extent, at least, the military sector of a society must function outside the realm of democratic principles, including the principle of freedom of expression. . . .
>
> . . . Certainly, members of the armed forces, at least when operating in that capacity, can be restricted in their right to open discussion.

Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 935–36 (1963).

### III

The district court also struck down both AFR 30–1(9) and 35–15 as being facially overbroad. We also entertain significant doubts about the breadth and scope of the regulations. However, because we find that the regulations as applied in this case resulted in no viola-

---

7. Chief Justice Earl Warren wrote that:

it is indisputable that the tradition of our country, from the time of the Revolution until now, has supported the military establishment's broad power to deal with its own personnel. The most obvious reason is that courts are ill-equipped to determine the impact upon discipline that any particu-

lar intrusion upon military authority might have.
Warren, The Bill of Rights and the Military, 37 N.Y.U.L.Rev. 181, 187 (1962). Nowhere should that rule of non-interference have more vitality than when dealing with a combat zone situation.

tion of the first amendment, we do not believe, under applicable Supreme Court doctrine, that we may reach the question of the facial validity of the regulations on overbreadth grounds.[8]

A basic principle of constitutional adjudication is that "a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." Broadrick v. Oklahoma, 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973). Admittedly, a traditional exception to that rule has been carved out in the first amendment overbreadth area. See id. at 611–15, 93 S.Ct. 2908 and cases cited therein. However, the exception is a limited one and should only be invoked if the overbreadth is substantial when "judged in relation to the statute's plainly legitmate sweep." Id. at 615, 93 S.Ct. at 2918.

In Parker v. Levy, *supra,* the Supreme Court applied these principles to a military context. The Court recognized that "[t]he fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it. Doctrines of First Amend-

ment overbreadth . . . are not exempt from the operation of these principles." 417 U.S. at 758, 94 S.Ct. at 2563.

Consequently, the limited nature of the overbreadth exception to the ban on asserting vicarious constitutional rights when read with its even more limited application in a military setting appears to preclude its invocation in this case. Any potential overbreadth to the regulations at issue is not sufficiently substantial in comparison with its legitimate sweep so that servicemen in a combat zone situation accused of violating them may test their facial constitutionality.

## IV

Our holding today is a modest one.[9] We find that a prior approval requirement for petitioning activities is reasonable in a combat zone setting. Hence, appellees' arrests were valid, and the district court's order of expungement must be reversed. We also conclude that the commanders in this situation exercised reasonable discretion in denying appellees' requests to conduct their first amendment activity. However, we reach no conclusions as to the facial validity of the regulations, as we are precluded from reaching that issue on the record before us. We reverse the grant of summary judgment for appellees and

---

**8.** The district court referred to AFR 30–1(9) as vague, but defined that what it meant in that context was that "by reason of such vagueness [it became] overly broad in [its] application." 364 F.Supp. at 633 n. 12 (citation omitted). The discussion *infra* adequately disposes of that holding. The court also held that the operative language of AFR 35–15, "morale", "loyalty", and "discipline" are also ambiguous and vague. Id. at 633, 639–40. However, as we noted above, the district court opinion issued before the Supreme Court's decision in Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). We think *Parker* adequately disposes of the vagueness issue, at least in the combat zone context, and that, for similar reasons as we set out above for overbreadth, we need not reach the question in other contexts.

**9.** The Government urges us to dismiss the case as moot. Clearly, Carlson may contest the propriety of his arrest as collateral consequences may as yet flow from the record-

keeping emanating from it. *See* United States v. Battle, 166 U.S.App.D.C. ——, 510 F.2d 776, 777 (1975); Sullivan v. Murphy, 156 U.S.App.D.C. 28, 478 F.2d 938, 962, cert. denied, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973). *See also* Sibron v. New York, 392 U.S. 40, 51–55, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). We must also agree with the district court that the alleged constitutional violations (albeit not in identical circumstances) "are capable of being repeated as long as the challenged regulations remained in force. This situation appears to fit neatly into the category of cases which present questions 'capable of repetition yet evading review.' " 364 F.Supp. at 630, *citing* Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1964). Our conclusion is buttressed by our realization that if we found that the regulations as applied violated the first amendment, there was a substantial possibility that the regulations were facially invalid because of their overbreadth.

remand with instructions that summary judgment be entered for appellants.

So ordered.

BAZELON, Chief Judge (dissenting):

What is most disheartening about this case is the United States military authorities felt themselves threatened by an innocuous petition against the War in Vietnam. This Court upholds this determination that a "clear danger to the loyalty, discipline and morale"[1] of American armed forces is presented by the following respectful words:

> We . , . wish to express our opposition to further United States military involvement by air, sea or land forces in Vietnam, Laos, Cambodia or other countries in South East Asia. We petition the United States Congress to take whatever action necessary to assure an immediate cessation of all hostilities in South East Asia. . . .

I wonder how the same military officers would view the danger to morale and discipline presented by this, much less "respectful" language:

> We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed, That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to affect their Safety and Happiness.

The terrible irony is that, like the oft-mentioned Vietnamese village, we have chosen to destroy American constitutional traditions in order to preserve our way of life. The pity is that here the "threat" is much too trivial for the price we pay. As I stated in another context, we use a sledgehammer to chase a gnat.[2] And we ought to look closely at what else is smashed beneath our blow.

Mr. Justice Stewart has correctly noted that there "is never a paucity of arguments in favor of limiting the freedom of the press."[3] Here the arguments are directed to the need for military efficiency. And courts are naturally loathe to interfere with the operations of the military. Courts, rightly or wrongly, fear the absence of any judicially manageable standards in attempts to impose constitutional requirements. This approach largely informs the Court's opinion in this case, mandating a virtually total deference to military judgment. There is something "different" about the military which requires a "different" application of constitutional guarantees.[4] Once this admission is made, the definition of what exactly is "different" is a subject that falls easily into the supposed expertise of military

---

1. Air Force Regulation 35–15; *see id.* 30–1(9), reprinted in Carlson v. Schlesinger, 364 F.Supp. 626, 629–30 (D.D.C.1973). The elucidation of these standards in their application to Carlson, Randig and Daniels was supplied *post hoc* by the Base Commanders and is reprinted in the Court's opinion in note 4. The arguments presented therein are considered *infra*, 167 U.S.App.D.C. pp. —— – ——, 511 F.2d p. 1336. For similar Army and Navy regulations, *see* Note, Prior Restraints in the Military, 73 Colum.L.Rev. 1089, 1090–91 (1973).

2. Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 473 F.2d 16, 64 (1972),

cert. denied 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973) (Bazelon, C. J. dissenting).

3. Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 144, 93 S.Ct. 2080, 2107, 36 L.Ed.2d 772 (1973).

4. Avrech v. Secretary of Navy, 155 U.S.App. D.C. 352, 477 F.2d 1237, 1244 (1973), rev'd on other grounds, 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974) *citing* Kauffman v. Secretary of the Air Force, 135 U.S.App.D.C. 1, 415 F.2d 991, 997 (1969), cert. denied, 396 U.S. 1013, 90 S.Ct. 572, 24 L.Ed.2d 505 (1970).

authorities. The real issue is whether the principle of Marbury v. Madison should apply to disciplinary actions taken by the military. Of course, no court will ever say that it does not, but we can be fairly certain that judicial review of military actions in practice will, if the Court's opinion here is followed, be indistinguishable from the review applicable if Marbury v. Madison is not followed in the military.

But even under the standards of review I suggest, the vitality of First Amendment traditions must be maintained by military authorities themselves or .those traditions will be lost. As discussed in more detail below, there are many pressures which accentuate the already remote character of judicial review and make vindication of First Amendment rights in the courts largely dependent on the necessarily selective litigation activities of organizations such as the American Civil Liberties Union (which is supporting this litigation). And if I am sustained in this belief, the fact that the military found this petition under review objectionable augurs poorly for the future of the First Amendment rights of American soldiers. We are once more witness to how shallow is our commitment to this, the most precious of our constitutional freedoms.

The organization of this dissent is as follows. I first discuss why I find the Regulations under dispute here are unconstitutional as an abridgement of the First Amendment as applied to the petitioning activities of Carlson, Randig and Daniels. This argument involves a consideration of the arguments raised in support of the suppression of the petition and a rejection of an *ad hoc* review of command discretion as a permissible "balance" of the various interests repre-

sented by the government's arguments and the First Amendment interests of the soldiers. I then find that the Regulations are on their face an overbroad regulation of° expressive activity and hence unconstitutional *in toto*. I would affirm the District Court with modifications.

I. *The Regulations Are Unconstituional As Applied to the Activity of Carlson, Randig and Daniels.*

The facts are as the Court states them. I add only a few observations. James Carlson, Richard Randig and William C. Daniels were not combat personnel (Carlson was a Navy storekeeper, 3d Grade; Randig and Daniels worked in the Cam Ranh Bay Air Force Hospital) and their petitioning activity took place at or near recreational areas or living quarters on the Cam Ranh Bay Air Base and the Tan Son Nhut Air Base. They were engaged in what is clearly the most traditional and respectful form of expressive activity, associating to petition the government for a redress of grievances.[5] Their expressive activity involved no call to resist military authority, to disobey orders or to in any manner interfere with the war effort. The activity was carried on while Carlson, Randig and Daniels were off-duty and not while the Air Bases were under actual or imminent attack. The later request to circulate the petitions submitted by Randig and Daniels to the Cam Ranh Bay Base Commander specified a number of limitations which the petitioners were willing to observe.[6] As for the Regulations themselves, it is important to recall that they regulate only expressive activity and do not regulate any conduct other than that associated with possession and distribution of written material.

---

**5.** A useful comparison is to the many recent cases protecting political pamphleteering activities. *See* Flower v. United States, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972); Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); Chicago Area Military Project v. City of Chicago, 508 F.2d 921 (7th Cir. 1975); Albany Welfare Rights Org. v. Wyman, 493

F.2d 1319 (2d Cir. 1974); Kuszynski v. City of Oakland, 479 F.2d 1130 (9th Cir. 1973); Wolin v. Port of New York Authority, 392 F.2d 83 (2d Cir.), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968).

**6.** *See* the list reprinted in Carlson v. Schlesinger, 364 F.Supp. 626, 634 (D.D.C.1973).

The Court correctly notes that the expressive activity of Carlson, Randig and Daniels would be clearly entitled to constitutional protection if it occurred outside the military. The distinguishing factor in the particular military context under review here which the Court finds sufficient to deny constitutional protection is that the activity occurred in a battle zone. The activity, it must be noted, did not on this record in any manner interfere with the ongoing duties of Carlson, Randig or Daniels or with any soldiers to whom they approached about the petition, since the petitioning occurred while the soldiers were off-duty and not under attack. There is thus no compromise of military duty.[7] Rather the argument is that the exigencies of a battle zone require regulation of *off-duty* speech by soldiers.

The argument that off-duty speech by soldiers in a combat zone is subject to regulation is two-fold. First must be the assumption that exposure to speech opposing the political wisdom of a sol-dier's present military duty will reduce the efficiency of the American fighting force. Unless soldiers are shielded from dissent, unless the government is given full sway to convince them of the political wisdom of military policy, our military strength would be compromised in a palpable manner. However, American soldiers are not motivated by a pristine conception of the wisdom of governmental war policy. I think, and any society which truly believes in a First Amendment must assume, that soldiers like other citizens can disagree with governmental policy and yet still realize that they must follow the legal requisites of that policy, including military service, until the policy is changed by democratic means.[8] Disaffection with war aims which causes shirking of military duty may be handled on an individual basis in light of the specifics of the solider's conduct. But the mere possibility of such conduct is not sufficient to justify repeal of the First Amendment in a battle zone. Speech that encourages or incites imminent lawless action would, of course,

---

**7.** *Cf.* Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Tygrett v. Washington, No. 72–1876 (D.C.Cir. Oct. 23, 1974); Goldwasser v. Brown, 135 U.S.App. D.C. 222, 417 F.2d 1169 (1969). These cases support the proposition that the government may restrict the free speech of its employees which interfere with on-going duties. They do not support a generalized regulation of speech outside of the performance of the governmental duties. *Cf.* Alderman v. Philadelphia Housing Authority, 496 F.2d 164 (3d Cir.), cert. denied 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974); Illinois State Employee Union, Council 34 v. Lewis, 473 F.2d 561 (7th Cir. 1972), cert. den., 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). *See also* note 9 *infra.* What *Pickering* and related cases would permit is a regulation of speech made during combat duty, in the trenches as it were. I doubt whether any soldier would want to circulate a petition while under enemy fire, however. I do not think *Pickering* can be extended in the military context to justify regulation of off-duty speech.

**8.** *See* Note, Military Discipline and Political Expression: A New Look at an Old Bugbear, 6 Harv.Civ.Rights-Civ.Lib.L.Rev. 525, 532–44 (1971). I am not impressed by the reasoning of Dash v. Commanding General, Fort Jackson, 307 F.Supp. 849, 856–57 (D.S.C.1969), aff'd, 429 F.2d 427 (4th Cir. 1970), cert. denied, 401 U.S. 981, 91 S.Ct. 1192, 28 L.Ed.2d 333 (1971), followed in Schneider v. Laird, 453 F.2d 345 (10th Cir.), cert. denied, 407 U.S. 914, 92 S.Ct. 2436, 32 L.Ed.2d 690 (1972). The court there propounds the rhetorical question: "Can training for participation in a war be carried on simultaneously with lectures on the immorality or injustice of such war?" The answer must be yes, unless we are willing to sacrifice our democratic traditions in order to defeat those who threaten those traditions. This is the same anomaly mentioned *supra,* 167 U.S.App.D.C. p. ——, 511 F.2d p. 1335. The *Dash* court also makes the extraordinary assertion that to permit anti-war lectures and literature would "undermine civilian government" by generating discontent among military personnel who supposedly would once corrupt not follow civilian orders. I think the conclusion opposite to that drawn by the court is the more plausible result of suppressing free discussion of the wisdom of the war: indoctrination of soldiers with the viewpoints held by incumbent politicians might undermine democratic traditions by implanting the idea that soldiers do not have the right to participate as citizens in our democratic form of government. *See* note 10 *infra.*

**1338**

present a different case.[9] There is absolutely no evidence that the activity of Carlson, Randig and Daniels was in any manner an incitement to illegal action.

Another aspect of this first argument may be that the government has, in order to maintain an efficient fighting force, the right to eliminate through exclusive propagandizing efforts any disagreement among soldiers with military policy. However, soldiers, like other citizens, retain the right to disagree with government policy. I agree with the Third Circuit that the military has no right to keep its personnel "politically antiseptic."[10] Furthermore, considering the availability of access to politically controversial views through magazines, newspapers and letters from home, it seems difficult to argue that the military is really committed on a full time basis to eliminating political views from its soldiers. Rather it appears that the military does not like to see that disagreement in public. No one seriously argues that such a policy is supported by any condition "peculiar to military life."[11]

The second aspect of the argument in favor of suppression of the petition is the most curious of all. This is that those who disagree with the content of the petition might retaliate against those who circulate it and thereupon "engage in serious breaches of discipline."[12] However, it seems apparent to me that the proper remedy for "serious breaches of discipline" is not curtailment of protected speech but the enforcement of disciplinary standards against those who would engage in such breaches.[13] This aspect of the argument is curious because the military operates on the basis of discipline and it hardly seems unreasonable to suppose that an organization that can maintain discipline in the heat of battle can also maintain discipline in the heat of political argument. Much of the discipline in military life is directed toward restraining isolated acts of aggressiveness to serve the purpose of unit co-operation and action and the purpose of maintaining respect for the command structure. Surely it is not too much to ask that maintenance of respect for the First Amendment rights of others be in-

**9.** *See* Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). *Cf.* Parker v. Levy, 417 U.S. 733, 761, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (counseling the disobeyance of orders is not protected speech in a military context). The concerns voiced in Terminiello v. City of Chicago, 337 U.S. 1, 26, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (Jackson, J. dissenting) would presumably be applicable in the military context.

**10.** Spock v. David, 469 F.2d 1047, 1055–56 (3d Cir.), stay denied sub nom. Laird v. Spock, 409 U.S. 971, 93 S.Ct. 301, 34 L.Ed.2d 235 (1972), on subsequent appeal, Spock v. David, 502 F.2d 953 (3d Cir.1974), cert. granted —— U.S. ——, 95 S.Ct. 1556, 43 L.Ed.2d 773 (1975). *Cf.* Carrington v. Rash, 380 U.S. 89, 93–96, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). Indeed, a politically antiseptic soldier might not be sufficiently aware of his responsibilities to distinguish between a legal and an illegal order. *Compare* United States v. Calley, 22 U.S.C. M.A. 534 (1973). *See also* Flower v. United States, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972). Several courts have indicated that the military may not have untrammelled authority to define the life-styles of its soldiers. *See* Hough v. Seaman, 493 F.2d 298 (4th Cir. 1974); Miller v. Ackerman, 488 F.2d 920 (8th Cir. 1973); Friedman v. Froehlke, 470 F.2d

1351 (1st Cir. 1972); Anderson v. Laird, 151 U.S.App.D.C. 112, 466 F.2d 283, cert. denied, 409 U.S. 1076, 93 S.Ct. 690, 34 L.Ed.2d 665 (1972).

**11.** Avrech v. Secretary of Navy, 155 U.S.App. D.C. 352, 477 F.2d 1237, 1244 (1973), rev'd on other grounds, 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974). *See* the limiting construction discussed Parker v. Levy, 417 U.S. 733, 752–53, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

**12.** Dash v. Commanding General, Fort Jackson, 307 F.Supp. 849, 857 (D.S.C.1969), aff'd, 429 F.2d 427 (4th Cir. 1970), cert. denied, 401 U.S. 981, 91 S.Ct. 1192, 28 L.Ed.2d 333 (1971), followed in Schneider v. Laird, 453 F.2d 345 (10th Cir.), cert. denied, 407 U.S. 914, 92 S.Ct. 2436, 32 L.Ed.2d 690 (1972) *and* Noland v. Irby, 341 F.Supp. 818 (W.D.Ky.1971), aff'd mem. No. 71–1661 (6th Cir.), cert. denied sub nom. Noland v. Desobry, 409 U.S. 934, 93 S.Ct. 234, 34 L.Ed.2d 188 (1972).

**13.** *See* Wright v. Georgia, 373 U.S. 284, 293, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963); Wolin v. Port of New York Authority, 392 F.2d 83, 92, 94 & n. 16 (2d Cir.), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968).

cluded in the pantheon of values served by military discipline. We can conjure a situation in which particular speech is so abhorrent to American soldiers that they rise up *en masse* and overcome all disciplinary restraints that could reasonably be imposed. It is enough here to point out that no such fears are reasonable in light of the nature of Carlson's petition.[14]

The approach I have suggested essentially relies on control of actions by dissident soldiers in lieu of controls on speech of all soldiers who might influence others to engage in proscribable conduct. This means that the military might be forced to risk the injury of this conduct before acting to deter it or contain it. This is clearly a cost of maintaining a system of free expression. All the evidence we have indicates that the danger in American society is trivial, due to traditional respect for the legal order. There is no proof of this one way or the other. Certainly, neither the government nor the Court presents us with evidence to the contrary. Rather, we must make an assumption both that the costs of permitting free exchange of views will not include the destruction of our legal order and that those costs are less than the costs of suppressing speech. This is not a self-evident assumption and I can readily see how some would question it as soon as circumstances are "different" enough to ignore the fact that society has accepted this assumption, for better or worse, in its daily functioning.

What concerns me most about those citizens who would prefer risking the costs of suppression in lieu of the costs of free expression is their underestimation of the costs of suppression and the

possibilities of abuse. Those possibilities are present in this case, although there is of course, no way to determine whether the particular suppression involved here constitutes such an abuse. Those possibilities would include (1) suppression because the commander personally disagrees with the political message communicated; (2) suppression because the political message is unpopular among the troops; (3) suppression because the political message is embarrassing to an incumbent politician who might be Commander-in-Chief; (4) suppression because the speaker is "different" and is generally perceived as an undesirable; (5) suppression because the commander personally feels insulted by the speech and wishes to firmly establish his disciplinary control; (6) suppression because of a desire to avoid the appearance of political dissension among the troops. The costs of suppression are that American citizens, serving temporarily or full-time in the military, will remain unexposed to differing points of view and their ability to exercise their democratic rights, upon which our nation is founded, prejudiced thereby.[15]

It is no solution to this weighing of the costs of free expression and the costs of censorship to rely on an *ad hoc* review of command discretion in suppressing particular speech. I would not know how to weigh the dangers of free expression to military efficiency against the dangers of suppression and to consider the possibility of abuse in each particular case. If such a task is to be performed, it certainly must be totally within the discretion of the military, since judges cannot weigh dangers to military efficiency. Our function is to

14. *See* note 9 *supra*.

The government makes the further argument that permission to circulate these petitions might adversely affect relations with our allies the South Vietnamese. Suffice it to say in response to this argument that we may assume, absent a specific policy directive from qualified foreign policy decision makers, that our allies are aware that American policy is not reflected in the individual statements of American soldiers and that under our system of government American citizens retain the

right to disagree with government policy and the right to express that disagreement.

15. *See* Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 257, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), *citing* Mills v. Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966); Whitney v. California, 274 U.S. 357, 375–77, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring); Meicklejohn, The First Amendment is An Absolute, 1961 Supreme Court Rev. 245.

# 1340

determine what American society has chosen in general—whether to risk free expression or censorship. As a general matter I do not think that "conditions peculiar to military life" [16] are so different from civilian life that our basic assumptions about free expression are inapplicable. This has been the burden of my argument above. Specific classes of speech, such as counseling the disobeyance of orders, could constitute an exception to this general assumption in the context of the military.[17] But to permit a generalized regulation of the content of speech on the basis of the presumed dangers of free expression is to adopt a course of action I had thought was rejected by the passage of the First Amendment.

In making this argument, I wish to leave no doubt as to my intention. Disallowance of *ad hoc* review of command discretion does not mean that all speech in the military is protected, but rather that the function of the court is to determine which classes of speech are within constitutional protection and which are not. This is part and parcel of the traditional judicial role of determining what the law is. *Ad hoc* review of command discretion takes the judiciary beyond this role into a theoretical "partnership" with the military such as is contemplated with administrative agencies. Of course, I doubt whether the Court today, or any court for that matter, really means for such a partnership to exist. But that concept is the result of its reasoning and if it is to be abandoned, then it will be abandoned in favor of a virtually complete judicial abdication of its role to determine what the law is. This follows from the recognition that all speech is subject to potential proscription under the partnership theory and that abdication of the judicial role in the partner-

ship means a practical elimination of judicial review. And we would do well not to forget that judicial review serves important constitutional policies in and of itself. As is often stated in First Amendment jurisprudence, one reason for judicial review of the decisions of censoring agents is that the business of censors is to censor. "The censor's function is to restrict and to restrain", as former Chief Justice Warren reminded us not so long ago. Times Film Corp. v. City of Chicago, 365 U.S. 43, 68, 81 S.Ct. 391, 404, 5 L.Ed.2d 403 (1961). As told to me by a candid military intelligence official during the Second World War, the mission of the military requires that all constitutional doubts be resolved in favor of efficiency or the hope of a potential military benefit. It is for judges, he said, to tell us what the Constitution forbids. I would hew strictly to that role.

The Court makes a couple of remarkable assertions in the course of its argument that deserve refutation. First, the Court suggests that under its reasoning which adopts the government's position Carlson, Randig and Daniels would still be able to communicate their ideas by reading the petitions aloud or discussing it at informal group meetings. A subsidiary point to this is that the suppression of the circulation of the petition is merely a regulation of the "time, place and manner" of speech. The Court's error in these statements is the apparent belief that since the regulations under review concern only distribution and posting of written material, the military has no authority to prohibit reading aloud or informal discussion of political views. However, the military may and has used Articles 133 and 134 to proscribe the reading aloud of dissident language or the informal discussion of such topics.[18] The standard to justify sup-

---

**16.** Avrech v. Secretary of Navy, 155 U.S.App. D.C. 352, 477 F.2d 1237, 1244 (1973) rev'd on other grounds, 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974).

**17.** *See* notes 7, 9 *supra.*

**18.** *See* United States v. Priest, 21 U.S.C.M.A. 564 (1972); United States v. Harvey, 19 U.S.

C.M.A. 539 (1970); United States v. Daniels, 19 U.S.C.M.A. 529 (1970); United States v. Howe, 17 U.S.C.M.A. 165 (1967) and the prosecution of Mark Avrech discussed Avrech v. Secretary of Navy, 155 U.S.App.D.C. 352, 477 F.2d 1237 (1973), rev'd on other grounds, 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974).

pression under Articles 133 and 134 is virtually identical to the standard to justify suppression under the regulations attacked in this litigation.[19] Since the Court here approves that standard and delegates its administration almost entirely to military authorities, there is no rational way to avoid extension of the Court's reasoning here to the reading aloud or informal group discussion situation. It is the *communication* of the dissident views to other soldiers which brings to bear the alleged dangers to morale and discipline, not the fact that written material is posted or distributed instead of read aloud or discussed informally. I would think the most serious equal protection issues would be raised if the military could proscribe certain communications because they are written and not spoken.[20] Once this point is recognized, there can be no rational claim that the suppression of this petition is a reasonable regulation of the time, place or manner of speech. The military under the Court's opinion may in its discre-

tion suppress any controversial speech in a battle zone because of the content of the speech. I know of no case which extends the concept of a reasonable regulation of time and place to a complete proscription of expressive activity within the entire geographical area to which the speaker might go to speak.[21] This case involves censorship and not a regulation of the time and place of speech.

The Court's second minor error lies in its erection of a neat distinction between the existence of some form of prior restraint and the substantive standards to be applied in that prior restraint system. Such a distinction, for the purpose of determining the constitutionality of an arrest, is completely inconsistent with established authority and the Supreme Court has recently reaffirmed the principle: the fact that a permissible licensing scheme might be erected does not protect arrests made under a licensing scheme with defective standards.[22] The

**19.** *See* the discussion in Parker v. Levy, 417 U.S. 733, 753–54, 94 S.Ct. 2547, 2560, 41 L.Ed.2d 439 (1974). I note some puzzlement with the distinction made in *Parker* between "active opposition to the military policy of the United States" and "[d]isagreement with, or objection to, a policy of the government." Since I assume military policy is a policy of the government and that the difference between "active opposition" and mere "disagreement" lies only in whether one's views are expressd or kept to oneself, *cf. supra,* 167 U.S.App.D.C. p. ——, 511 F.2d pp. 1337–1338, I conclude that speech disagreeing with any form of military policy may be prohibited under the General Articles.

**20.** *Cf.* Police Dep't of Chicago v. Mosley, 408 U.S. 92, 93, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); Flower v. United States, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Fowler v. Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953); Niemotko v. Maryland, 340 U.S. 268, 71' S.Ct. 325, 95 L.Ed. 267 (1951). *See also* Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 130, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (*dictum*).

**21.** The cases cited in note 7 *supra,* of course, involved carefully limited exclusions from arenas in which controversial speech could be made. Here a soldier would, under the

Court's reasoning, have to return to the United States, which he cannot do without deserting, in order to reclaim his First Amendment freedoms, instead of simply moving two hundred yards away or speaking when off-duty.

The fact that under 10 U.S.C. § 1034 (1970) a soldier may write home his controversial views (particularly to a member of Congress) does not support the assertion that suppression of controversial material in a battle zone is a reasonable regulation of the time and place of expression. This would be analogous to asserting that since an individual can write a letter to the editor of the local newspaper, he or she has no right to demonstrate or petition. Indeed, § 1034 provides support for the assertions in the text that the petitioning activity of Carlson, Randig and Daniels, involving a petition directed to members of Congress, is constitutionally protected. The communication with Congress attempted by these soldiers simply required some association activity prior to the communication. Such associational activity is, of course, protected. *See* NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *cf.* Baird v. State Bar of Arizona, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967).

**22.** *See* Southeastern Promotions, Ltd. v. Conrad, —— U.S. ——, 95 S.Ct. 1239, 43

Court offers no authority or reasoning to support a different result in the military and I can perceive no such reasoning. As a practical matter, the military will always arrest the individual under the licensing scheme it considers valid. Judicial review is thus purely *post hoc* and declarative of future rights. We need not enter the thicket of damage claims here since Carlson asserts no such claim. The military is given practical authority to enforce its standards until there is a judicial decision to the contrary. It then certainly will have an opportunity to redefine its prior restraint standards to conform with the judicial mandate. There is thus no danger of interference in any manner with military duties. If the substantive standard of the prior restraint scheme is invalid, the whole scheme must fall. An arrest cannot be justified by a hypothetically valid licensing scheme.

II. *The Regulations Are Unconstitutional On Their Face As an Overbroad Regulation of Protected First Amendment Activity*

I think the Court is correct under its view of the constitutionality of the regulations as applied to the activity of Carlson, Randig and Daniels in finding that the soldiers may not challenge the potential overbreadth of the regulations. This is a result of a subsidiary holding in Parker v. Levy, 417 U.S. 733, 760–61, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) to the effect that where the complainant's own

speech or conduct may be constitutionally proscribed, he may not challenge peripheral applications of the statutes or regulations [23] in issue. My view of the potential overbreadth of the regulations in issue here is different from the Court's because I conclude that Carlson, Randig and Daniels were engaged in constitutionally protected activity. The soldiers would thus under my reasoning have standing to challenge the potential overbreadth of the regulations.

Before exploring that issue, I think it appropriate to question whether after *Parker* any overbreadth scrutiny of military regulations is proper. *Parker* purports to accept overbreadth review, finding only that the policies of the doctrine do not require invalidation in a particular context. However, the holding on standing mentioned above and the numerous dicta in the opinion to the effect that the military is permitted "greater breadth and . . . greater flexibility" in regulating expression [24] intimate the Court disapproved utilization of overbreadth doctrine *in toto*. Both the holding on standing and the dicta on "greater breadth" reject, at least in part, the policies of the overbreadth doctrine, particularly the concept that impediments to judicial review of statutes which potentially chill protected activity should be minimized.[25] Indeed, the overbreadth doctrine has not been without its critics when applied to non-military situations.[26] But absent a clearer state-

L.Ed.2d 448 (1975) *citing* Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Of course, in the *Conrad* case, the "arrest" was not of a person but of a production. However, the principle relevant to my discussion is the same: the fact that the halt of the production might be justified under some licensing scheme does not protect the arrest made under a defective scheme.

23. The largely executive character of military "law" makes any constitutional distinction between statutes and regulations of little aid. However, vague regulations permit the sort of abdication of law-making responsibility to lower level officials that was condemned in Smith v. Goguen, 415 U.S. 566, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) and this "delegation" rationale is not therefore inapplicable to military law. *See* note 31 *infra.*

24. 417 U.S. at 756, 94 S.Ct. 2547.

25. *See* Lewis v. City of New Orleans, 415 U.S. 130, 134, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), *quoting* Gooding v. Wilson, 405 U.S. 518, 521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 833, 852–58 (1970).

26. *See* Lewis v. City of New Orleans, 415 U.S. 130, 136, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974) (Blackmun, J. dissenting); Saia v. New York, 334 U.S. 558, 571, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948) (Jackson, J. dissenting); Winters v. New York, 333 U.S. 507, 527, 68 S.Ct. 665,

ment than that contained in *Parker*, I am unwilling to remove military regulations from overbreadth scrutiny. In fact, I see a greater need for utilization of overbreadth doctrine in the military context since the chilling effect of overbroad regulations both on the engagement in protected activity and the utilization of judicial review of military restrictions on free expression is multiplied by the necessarily omnipresent command structure, which in imposing sanctions is not as limited by traditional legal processes as are civil authorities.[27] Furthermore, access to courts, particularly for servicemen overseas, and the availability of funds to finance litigation are both more limited in the military context.

There is no condition peculiar to military life which makes the criticism of the overbreadth doctrine any more persuasive in that context. Rather the distinction, which I believe is implicit in *Parker*, is that the governmental interests in regulating expression are greater than civilian interests offered in support of the suppression of free speech. But this interest goes to the definition of free speech in the military and not to the use of overbreadth doctrine once it is determined that even under that definition a challenged regulatory scheme sweeps too broadly. I think overbreadth review in the military context is proper.

Turning to the regulations in issue, I notice that these regulations deal only with the proscription of protected expression—circulation of petitions and written materials. The regulations are thus unlike the General Articles upheld in *Parker* which covered a broad range of *conduct* as well as protected expression. The scope of the regulations must be limited, as were the general articles in *Parker*, by decisions of the Court of Military Appeals.[28] Even with this "limiting" construction, if it may be so named, I think the terms "loyalty", "morale" and "discipline" could sweep in virtually all controversial written material whether distributed in the United States[29] or in a war zone. The core of this proscription must certainly be the case we confront today—distribution of controversial views attacking the political wisdom of military policy. Indeed, the regulations have been applied to situations less compelling from the military's standpoint than the situation *sub judice*.[30] Since I would hold that the protected activity we confront here is constitutionally protected, it follows that the regulations are in major part "susceptible of application to protected speech"[31] and do not prohibit only a

92 L.Ed. 840 (1948) (Frankfurter, J. dissenting).

**27.** *See* Tatum v. Laird, 144 U.S.App.D.C. 72, 444 F.2d 947, 957–58 (1971), rev'd, 408 U.S. 1, 92 S.Ct. 231, 33 L.Ed.2d 154 (1972), *citing* National Student Ass'n v. Hershey, 134 U.S. App.D.C. 56, 412 F.2d 1103, 1118 (1969).

**28.** *See* Parker v. Levy, 417 U.S. 733, 753–54, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). Use of this limiting construction is appropriate since the General Article could be used to enforce the regulations in issue with criminal sanctions. *See* Manuel for Courts-Martial ¶ 213f(5), at 28–77 (1969). The regulations could also be criminally enforced through Article 92, 10 U.S.C. § 892(1) (1970); *See* Note, *supra* note 1, at 1091 n. 20. Similar "limitations" were imposed in Dash v. Commanding General, Fort Jackson, 307 F.Supp. 849, 855 (D.S.C.1969), aff'd, 429 F.2d 427 (4th Cir. 1970), cert. denied, 401 U.S. 981, 91 S.Ct. 1192, 28 L.Ed.2d 333 (1971). *See* discussion of Army and Navy regulations in Note, *supra*.

**29.** The regulations apply on their face to certain expressive activities "within an Air Force facility or by a member when in uniform or when in a foreign country . . . ." The regulations thus apply to expressive activity in the United States.

**30.** *See* cases cited note 12 *supra*; Culver v. Secretary of Air Force, 389 F.Supp. 331, 103 Daily Wash.L.Rep. 485 (D.D.C. Feb. 14, 1975). *Cf.* the Article 133–134 cases cited note 18 *supra*. Some of these cases did not occur in a battle zone and some did not involve distribution of written material.

**31.** Lewis v. City of New Orleans, 415 U.S. 130, 134, 94 S.Ct. 970, 973, 39 L.Ed.2d 214 (1974); Gooding v. Wilson, 405 U.S. 518, 521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). I place emphasis on the word "susceptible." With the so-called "limiting" construction suggested in the text, there is still a large degree of uncertainty about the scope of the regulations. This contributes substantially to a finding of overbreadth since the regulations

"whole range of easily identifiable and constitutionally proscribable . . . conduct." [32] I would hold that the regulations are unconstitutional on their face.

Since Carlson, Randig and Daniels were not criminally prosecuted for their actions and since *Parker* warns us to distinguish between claims of overbreadth and claims of vagueness, I see no need to determine whether the terms "loyalty", "discipline" and "morale" are unconstitutionally vague under the standards applicable to military regulations. These terms are broad enough in my view to sweep in a substantial amount of protected activity and this is relevant to the overbreadth holding. But since the situation of these plaintiffs does not require that I consider whether the terms also provide "fair notice" in a criminal prosecution, an explicit vagueness holding is not appropriate.

There is a further reason why the prior restraint scheme established by the regulations under review does not pass constitutional muster: its lack of procedural safeguards in the determination of what speech is protected and what is not. The requirement of such safeguards is part of overbreadth review.[33] Here the entire suppression decision is left to the hands of a commanding officer with no form at all of mandatory or swift review by military or civilian courts. While the procedural safeguards in the military must by necessity (at least in a battle zone) be different from those required in the civilian context,[34] the total lack of any procedural safeguards in the scheme under review requires that scheme be declared unconstitutional. I see no argument that prompt review by a detached official such as the Inspector-General or military courts with a guarantee of civilian review when possible interferes with any legitimate military interest. Such a scheme would permit the military to take actions in exigent, and indeed non-exigent circumstances as the case might require. The scheme only insures that there will be review and the harm to protected expression be limited as much as is feasible.

Implicit in the preceding discussion is the conclusion that some form of prior restraint would be permissible in the military. The speech which such a scheme could proscribe would be (1) interference with on-going military duty [35]; (2) speech counseling the disobeyance of orders [36]; or (3) speech that threatens an

"necessarily leave all persons to guess just what the law really means to cover and fear of a wrong guess inevitably leads people to forego" their First Amendment rights. Barenblatt v. United States, 360 U.S. 109, 137, 79 S.Ct. 1081, 1099, 3 L.Ed.2d 1115 (1959) (Black, J. dissenting); *see* Davis v. Ichord, 143 U.S.App.D.C. 183, 442 F.2d 1207, 1214 (1970). This uncertainty also contributes to the potential of misapplication by lower-level officers. For examples of just such misapplication, *see* Petitioner's Brief for Certiorari at 6, Schneider v. Laird, 407 U.S. 914, 92 S.Ct. 2436, 32 L.Ed.2d 690 (1972); Petitioner's Brief for Certiorari at 7, Noland v. Desobry, 409 U.S. 934, 93 S.Ct. 234, 34 L.Ed.2d 188 (1972). This potential delegation of law-making authority to lower-level officials adds to the overbreadth of the law. *See* United States v. Robel, 389 U.S. 258, 272–82, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (Brennan, J., concurring); National Student Ass'n v. Hershey, 134 U.S. App.D.C. 56, 412 F.2d 1103, 1118 (1969); Note, *supra* note 25, at 924–25. *Cf.* Illinois Citizens Comm. for Broadcasting v. FCC, No. 73–1652, 169 U.S.App.D.C. ——, 515 F.2d 397 (D.C.Cir. March 13, 1975) (Statement of Ba-

zelon, C. J.). *See also infra,* 167 U.S.App.D.C. p. ——, 511 F.2d p. 1344. I do not decide whether this uncertainty rises to the level of unconstitutional vagueness.

**32.** Parker v. Levy, 417 U.S. 733, 760, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974), *quoting* United States Civil Service Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 580–81, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

**33.** *See* Southeastern Promotions, Ltd. v. Conrad, —— U.S. ——, 95 S.Ct. 1239, 43 L.Ed.2d 448, 43 U.S.L.W. 4365, 4369–70 (U.S. March 18, 1975); Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); Monaghan, First Amendment "Due Process", 83 Harv.L.Rev. 518 (1970).

**34.** For example, the requirement of prompt judicial review would seemingly be impractical in some military circumstances.

**35.** *See* note 7 *supra*.

**36.** Parker v. Levy, 417 U.S. 733, 761, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

imminent and uncontrollable outbreak of violence.[37] To be valid, such a prior restraint scheme must employ certain procedural safeguards to ensure prompt, neutral review of command determinations under the scheme.[38] Even though the Court here today does not require this sort of limited censorship scheme, I would recommend it to the military anyhow. There is so little to lose and so much to gain by recognizing the individual rights of soldiers. An enlightened self-interest should be sufficient to lead the military to abandon its fear of free expression. But for now the persistent and completely foreign arguments against free expression apparently hold sway. I sincerely hope their time will pass. I would recall the immortal argument of Justice Brandeis: [39]

> Those who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.

> Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women. It is the function of speech to free men from the bondage of irrational fears. . . .

> .    .    .    .    .

> Those who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty. To courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies,

---

**37.** *See* note 9 *supra.*

**38.** *See supra,* 167 U.S.App.D.C. p. ——, 511 F.2d p. 1344.

**39.** Whitney v. California, 274 U.S. 357, 375–77, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J. concurring). For the reasons stated by Justice Brandeis, the statement in Culver v. Secretary of Air Force, 389 F.Supp. 331, 103 Daily Wash.L.Rep. 485, 488 (D.D.C. Feb. 14, 1975) to the effect that participation in political demonstrations "cannot be squared with conventional concepts of good order, discipline and morale indoctrinated and engrained in the military establishment since the founding of the Republic" represents not the traditions of this Nation but rather the traditions of some other nations not committed to democratic forms of government.

to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.

I dissent.