Thomas S. CULVER, Appellant,

v.

SECRETARY OF the AIR FORCE.

No. 75–1468.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 31, 1976.
Decided Jan. 10, 1977.

Edward F. Sherman, Bloomington, Ind., of the bar of the Supreme Court of Texas, pro hac vice, by special leave of court, with whom David F. Addlestone, Washington, D. C., and Melvin Wulf, New York City, were on the brief for appellant.

Richard A. Graham, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on the brief for appellee.

Before BAZELON, Chief Judge, LEVENTHAL, Circuit Judge and CHRISTENSEN,* United States Senior District Judge for the District of Utah.

Opinion for the Court filed by Senior District Judge CHRISTENSEN (joined by Circuit Judge LEVENTHAL).

Concurring opinion filed by Circuit Judge LEVENTHAL.

Dissenting opinion filed by Chief Judge BAZELON.

CHRISTENSEN, Senior District Judge.

The appellant, Thomas S. Culver, a captain in the Judge Advocate General's Corps of the United States Air Force stationed at the Royal Air Force (RAF) Base in Lakenheath, Suffolk, England, in July, 1971, was tried and convicted by general court-martial on charges of conduct unbecoming an officer and a gentleman, in violation of Article 133 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 933 (1970),[1] in that on May 24, 1971, he solicited other military personnel to violate a general Air Force Regulation, AFR 35–15, ¶ 3e(3)(b)(8),[2] prohibiting Air Force personnel from participating in demonstrations in foreign countries, and of violating the last cited regulation in contravention of Article 92, UCMJ, 10 U.S.C. § 892 (1970),[3] by himself participating in a demonstration in London on May 31, 1971. Appellant was sentenced to a fine of $1000 and reprimand. The court-martial judgment was approved by the Commander of the Third Air Force and by the Judge Advocate General of the Air Force, pursuant to Article 69, UCMJ, and further review was denied. Appellee, the Secretary of the Air Force, is the administrative head possessing authority to void appellant's court-martial conviction and sentence. Appellant has since received an honorable discharge from the military.

Appellant filed this suit in the district court on June 5, 1973, to attack collaterally his court-martial conviction. Declaratory and injunctive relief and compensation for claimed monetary losses were sought on the contention that the Air Force regulation upon which his conviction was based was unconstitutionally vague and overbroad. The district court, following briefing and argument, and having before it the record of appellant's court-martial proceedings and its military review, granted appellee's motion for summary judgment and dismissed the action.[4] It was the conclusion of the trial court that there had been a demonstration in the foreign country contrary to the regulation in question as to which appellant had both participated and invited participation as charged; that like Captain Levy in *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), he had reasonable notice that his conduct was punishable and thus his claim of vagueness was without merit, and that the challenged regulation was not overbroad, either on its face or as applied to the facts of the case.

On this appeal the appellant renews his attack against the regulation for claimed vagueness and overbreadth.[5] The appellee

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. "Any commissioned officer . . . who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct."

2. "Members of the Air Force are prohibited from participating in demonstrations when:
    (a) on duty.
    (b) In a foreign country.
    (c) In uniform in violation of AFM 35–10.
    (d) Their activities constitute a breach of law and order.
    (e) Violence is likely to result."

3. "Any person subject to this chapter who—

(1) violates or fails to obey any lawful general order or regulation;
(2) having knowledge of any other lawful order issued by a member of the armed forces, which it is his duty to obey, fails to obey the order; or
(3) is derelict in the performance of his duties; shall be punished as a court-martial may direct."

4. *Culver v. Secretary of the Air Force*, 389 F.Supp. 331 (D.D.C.1975).

5. Appellant argues, among other things, that the operative word, "demonstration", is so vague as not to give members of the Air Force adequate notice of what is prohibited since the

defends the regulation and its application here asserting that it is supported by legitimate military interests and is constitutional.[6]

It seems neither necessary nor desirable in this case to attempt a comprehensive analysis of the authorities generally treating the questions of overbreadth or vagueness. There could be a temptation in such a crowded legal art to become captives of collateral problems of the past and the apprehensions of the future in diversion from issues presently before us. The timing and circumstances of this case lie somewhere between the travail of Vietnam and prior wars and, hopefully, the more complete release of freedom from the remaining constraints of military necessity abroad, as well as at home. The principles which are immediately controlling here have been so recently expounded in *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), and *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), *supra* (see also *Middendorf v. Henry*, 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976) and *Com-*

*mittee for G. I. Rights v. Calloway*, 171 U.S.App.D.C. 73, 518 F.2d 466 (1975)), as to make our principal task an understanding and statement of the controlling facts in light of them.

On May 24, 1971, Captain Robert L. Cole, a friend and coworker of appellant in the Staff Judge Advocate's Office of the 48th Combat Support Group, in company with a staff sergeant and the latter's wife, saw the appellant standing at the side of a heavily traveled road which carried traffic between Lackenheath Village and two RAF bases in England, apparently handing to passing motorists papers from a bunch held over his arm. As Captain Cole's car slowed down in passing, the appellant leaned forward and gave the captain one of the papers through an open window of the car. Both Captain Cole and the sergeant were in uniform but appellant was then dressed in civilian clothes. Neither appellant nor Cole spoke or showed any sign of recognition. The paper as it was handed to him by appellant and read by Captain Cole that evening was identical to a document identified as Prosecution Exhibit No. 3 at the court-martial.

term is nowhere defined in the regulation and no gloss is provided by military administrative materials or cases to aid in its definition; that the term is so broad as to include many assemblages in which American servicemen participated in England without any attempt at prosecution; that any justification for the regulation was to preserve harmony with host nations by avoiding demonstrative participation in local political issues as distinguished from those controversial only in the United States; that while there could be "a legitimate military interest in forbidding off-post activities which, having taken the form of a demonstration, constitute a serious interference in the host nation's politics or detract from harmonious relations with the host nation . . . the military judge and the lower court [should] have limited the scope of the word 'demonstration' by requiring a determination that the interest in harmonious relations [had to be] adversely affected"; that the fact that the word is generally known and in common usage does not make it acceptable, without sufficient limitation; that the word is as vulnerable to the charge of vagueness as such words as "contemptuously" held vulnerable in *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974), "gang" dealt with in *Lanzetta v. New Jersey*, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), or "annoying" considered in *Coates v. City of Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).

It is particularly argued that "since the servicemen's right to engage in a presentation of petitions addressed to the President and Congress is firmly established by statute, regulations and the Constitution", the appellant and those similarly situated had the right to publicly "present" petitions to the American Ambassador in London for transmittal to the President and the Congress.

6. The appellee contends that the word "demonstration" when examined in context is sufficiently explicit to have put appellant on notice as to the nature of the activity proscribed; that his actual notice of the exact nature of the prohibited conduct deprives him of standing to assert that the language is vague on its face; that the military judge appropriately defined the term; that the determination of the court-martial as to the fact that the involved conduct constituted a demonstration is binding; that as to claimed overbreadth, appellant similarly had no standing since his conduct was clearly within the legitimate constraints of the regulation; and that when viewed in context, the entire prohibition against participation in demonstrations in foreign countries is supported by legitimate military interests and does not impermissibly extend to constitutionally protected activities.

Appellant's brief, rather blandly describes this paper and rests much of his argument upon such a characterization.[7]

Appellant's description does not indicate fully the nature of the document or its purposes. In various kinds of type and arrangements which lent emphasis in some instances and deemphasis in others, the following are some additional comments that appeared:

> People Emerging Against Corrupt Establishments . . . okay—you're opposed to the war. What are you doing about it? . . . The Third Airforce G.I.'s are uniting to express our disapproval of the war in Vietnam. Antiwar petitions are circulating. Sign one now! But don't stop there. Come with us when we exercise our constitutional rights and present the petitions to the U.S. Ambassadors at the U.S. Embassy who must send them to Washington.

> The presentation. Some people have asked me if the presentation on the 31st will be legal. The answer is that it will be. It is clear that under AFR 35–15 it is an offense to attend a demonstration in a country other than the U.S. But this will not be a demonstration. . . . The recent amendment of AFM 35–10 makes it clear that it would be an offense to wear a uniform to even this type of gathering. So no uniforms. Also it is very possible that the fuzz will be around and perhaps even two of the coaches with their doggies, so it is imperative that everyone is clean—that doesn't mean take a bath, it means no dope. So as long as we are clean and don't make any trouble there is nothing wrong with coming to the presentation. If somebody tells

you otherwise, as some are doing, it is just . . . [B.S.] With the kind of entertainment we are going to have there will be hundreds coming, so they won't even be able to hassle most of us. But that isn't the important point. It is legal. All we are doing is exercising a right that we have as Americans, to present our petition to the government and to have a party. So make sure that you get your bus tickets so you can come along. . .

> The Petition. . . . The plain fact is that there is nothing wrong with circulating the petition unless you can call doing so a demonstration. That requires a stretch of the verbiage that even a court-martial would find difficult to make. Even if that stretch is made you run smack into the First Amendment to the Constitution which guarantees the right of the people to petition the government and that if followed by AFR 35–15 as quoted on the petition's form. Don't you think they would love to charge those guys who have been arrested. The reason they haven't is that they can't, it is just no offense. So get out there and get some more signatures so we can give the Ambassador a bundle on the 31st. . .

> So we can keep the group together, buses will leave the front gates of the bases at the following times. . . . Only when a large number of G.I.'s turn out can we have an effect.

On the same day, May 24, special agent James A. Allen of the Office of Special Investigation received information that appellant was distributing leaflets on Lord's Walk. Driving past the appellant at a low

---

7. The leaflet . . . stated that the Third Air Force servicemen from six English installations would present petitions to the President and Congress expressing opposition to the Vietnam war at the American Embassy in London on May 31, 1971. The leaflet called for joining "in presenting your opinion to the President and Congress", stating "Come with us when we exercise our constitutional rights and present petitions to the U.S. Ambassador at the U.S. Embassy who must send them to Washington." It stated that this would not be a demonstra-

tion as "there will be no placards, no buttons, no marching or assaults, just a group of G.I.'s presenting a petition to the local representative of our Commander in Chief and our Congressional representatives." It also indicated that there would be a peace concert by certain named celebrities and musicians after the presentation and provided the names and addresses of airmen who could be contacted for information concerning the petitions and tickets for buses into London.

rate of speed Agent Allen extended his arm through the open window and received a leaflet from appellant which was identical to the prosecution exhibit referred to above.

On May 25, 1971, the Staff Judge Advocate of the 48th Combat Support Group, appellant's immediate superior, prepared and presented to the base Commander a statement interpreting the Air Force regulation in question for circulation to the command. A copy of this document was presented to the appellant who acknowledged the receipt of a copy. This document read as follows:

> Unofficial publications have recently offered opinions as to the legality of certain protests and dissent activities. Those opinions are incorrect. If accepted and acted upon they subject participants to severe punitive action. All personnel are advised that paragraph 3E3 of AFR 35–15, dissent and protest activities, specifically prohibits participation by military personnel in any demonstration in a foreign country. The prohibition applies whether the serviceman or servicewoman is on or off base, in or out of uniform, on or off duty. It also applies in full force irrespective of which term or name is given to the demonstration. Violation of the regulation carries a maximum punishment of a dishonorable discharge, total forfeitures, reduction to airmen basic, and confinement at hard labor for two years. Personnel considering participation in such activities should be aware of the true consequences, and not be misled by misinformation from whatever source. I have read and understood the above.

It seems a fair inference in view of the context of papers appellant had been circulating almost immediately theretofore and the reference in the interpretive statement to the differentiation between "presentation" and "demonstration" attempted by the sponsors, that the interpretive statement prior to the events hereafter recounted was known by appellant to refer to the specific occasion in which he must have been planning to participate.

On Memorial Day, May 31, 1971, Staff Sergeant Joseph E. Wilson took a chartered bus, along with about 30 other military personnel, to Speaker's Corner at Hyde Park, London, the site of one phase of the "presentation" described in the leaflet which appellant had distributed a week earlier. They were all dressed in civilian clothes. The group arrived at about 11:15 a. m. and found about 150 other military and civilian personnel already assembled. The group increased to about 200 by noon. As the group formed, the military members were handed white arm bands depicting a helmet and an upraised, clenched fist, and told to wear them. Lt. Col. Bernard H. Fowl, a director of security police at Third Air Force Headquarters who had come to London to observe the expected demonstration, saw a total of five buses come to Speaker's Corner that morning and deposit their passengers. After the last bus arrived more arm bands were passed out to the crowd. Then following a short conference with several police officers the organizers moved the group to a particular section of the corner to which the police pointed. Lt. Col. Fowl recalled that in addition to the corner group there were a great number of onlookers. Shortly thereafter the group sat down on the pavement. Then, according to Staff Sergeant Wilson, a group of six young men read a statement "to the press, news media, television cameras, concerning this presentation that [they] were to make." Lt. Col. Fowl described the scene in his testimony:

> After they moved the majority of the male members of this group, and I'd say somewhere between 50 and 75 of them, sat in a sort of a pie-shaped arrangement, semi-circular, with their backs to me. Then, in this group, six stood towards the front of this amphitheatre arrangement of people and more or less in the center of them with their backs to me. At about that time what appeared to be newspaper people with cameras and tape recorder, microphones, gathered around these six young men, or in front of them, and the six young men had, each one of them, had a piece of paper in his hand,

and it appeared as though one after the other was reading from the paper. This was being recorded, I think, by at least two people with tape recorders, and there were several cameramen there taking pictures. At the conclusion of the last man reading what he had to read, the crowds more or less in unison broke out in applause with such comments as "right on" being said. Each of these speakers raised his arm above his head when that occurred, some with the clenched fist and some with the V-signal, or whatever it's called.

Thereupon, as Sergeant Wilson testified, "The G.I.'s formed into groups according to their own base, to be handed the petitions that we were taking to the Ambassador. . . . Mr. Parker suggested that we should form up by our own particular groups, the Heyford Group in one area, say the Alconbury Group in another, Lakenheath Group in another . . . we formed a very rough and spread out [queue] and walked generally over to the U.S. Embassy. . . . Well it started off as a line, but as we got out of Hyde Park it no longer was a line. There were several small groups of approximately a half a dozen people walking along together. . . . We followed the underground way under the road to the street across from Hyde Park; now, we have to make a right turn and follow that down about two or three blocks, make a left turn, walk down about three more blocks and we were beside the embassy then. . . . The small groups were anywhere between 10 yards and 25 yards apart, and they were not even at one time a solid group."

As the members of each sub-group reached the Embassy, they entered to present their petition to an Embassy representative, then left the Embassy and returned to Hyde Park, boarded their buses, and were taken to Victoria Park for entertainment and a rock concert. During the assembly at Hyde Park and the proceedings at the Embassy, the appellant who wore a white arm band was identified and photographed.

Following the presentation of the prosecution's case in chief before the court-martial, two members of the Air Force who had actually witnessed the event of May 31 were called, whose testimony was largely confirmatory of what already had been presented. Commander Harold Hodgson of New Scotland Yard who was responsible for safeguarding the Hyde Park and the United States Embassy areas testified that on May 21 two organizers of the Hyde Park presentation informed him of their plans for May 31. They were told that the original plan was not acceptable because it entailed a large assembly at the Embassy. He suggested, however, that the group assemble in Speaker's Corner and move to the Embassy in small groups from there. Commander Hodgson then arranged for extra police to be on duty at the two sites involved and for 20 constables to be hidden a short distance away from the immediate area. The proceedings were orderly. The defense also called Valentine Gatress, a Cambridge Professor, to explain the history of Speaker's Corner in this role in neutralizing protest. Lord Soper of Kingsway, a member of the House of Lords, also testified for appellant, discussing the activity at Speaker's Corner from a viewpoint of the British attitude toward the presentation of petitions.

The actual circumstances, as shown by convincing evidence before the court-martial, obviate the necessity of theoretical characterizations or any nice balancing of authorities. They rather clearly establish that both as planned and as executed the occasion involved not a mere presentation but a demonstration pure and simple. And this is so, in the sense that the latter term would be applied by ordinary persons as well as understood in military context by most officers—particularly those having the appellant's exposure to the planning, purposes and effect of such an occasion so transparently transcending any mere presentation of a petition for consideration of public officials to whom or through whom it was addressed.

I agree generally with the observations and conclusions of Judge Pratt when he granted the government's motion for summary judgment, *Culver v. Secretary of the Air Force,* 389 F.Supp. 331 (D.D.C.1975), *supra,* especially as his general comments are pointed up by the subsequent decisions of the Supreme Court in *Greer* and *Middendorf, supra.*

■ The appellant reads altogether too narrowly the interest of the military in complying with the treaty obligation of the United States to avoid intervention in political affairs through its military forces.[8] It would be unseemly and possibly disruptive—or at least the military had the right to consider it so—for members of the military to engage in demonstrations in the host country no matter what political interest was being pressed. The treaty and the interest of the military in operating in a foreign country are not to be stated in terms of partisan political activity, but political activity in general, i. e., "of or pertaining to policy, or politics, or the conduct of government . . . or of, or pertaining to, the exercise of the functions, vested in those charged with the conduct of government.[9]

The Vietnam question, especially with respect to participation in the war, was highly political, no matter where discussed, and even the emotional impact of that political question as it involved the United States was not any the less political because it was dealt with and exploited in a friendly foreign country. The demonstrations involving it were of a kind within the military's province to avoid under the treaty as possibly embarrassing to the host country if political demonstrations on any subject or

any place could be considered so to be. The military had wide latitude in defining and implementing the military interest and necessity in these respects.

The argument that the restriction if given literal application would preclude church gatherings, environmental celebrations, band concerts and such things seems specious. There is a kind of gloss to the term "demonstration" as used in the regulation from the context of "protest and dissent" in which it appears, by the treaty obligation, the duties of visiting military personnel and their organizations which are quite separate from such political activity, and by the very meaning with which the word has come to be used. In the latter connection there seems no valid comparison between the word "demonstration" and other words which as appellant points out have been held to involve, in various contexts, impermissible vagueness, including "gang".[10] The following comment from *Greer v. Spock, supra,* at n. 10, has at least tangential bearing:

> . . . The decision of the military authorities that a civilian lecture on drug abuse, a religious service by a visiting preacher at the base chapel, or a rock musical concert would be supportive of the military mission of Fort Dix surely did not leave the authorities powerless thereafter to prevent any civilian from entering Fort Dix to speak on any subject whatever.

■ The appellant argues that the military judge's definition of "demonstration" as used in his instructions to the jury was too broad even though the word had acquired some gloss in the status-of-forces—protest and dissent—military interest sense

---

8. The Status-of-Forces Treaty, [1951] 4 U.S.T. 1792, T.I.A.S. No. 2486, art. II, in pertinent part provides: "It is the duty of a force and its civilian component and the members thereof as well as their dependents to respect the law of the receiving States and to abstain from any activities inconsistent with the spirit of the present Agreement, and, in particular, from any political activity in the receiving state. It is also the duty of the sending state to take necessary measures to that end. [1951] 4 U.S.T. at 1796."

9. Webster's New International Dictionary, 2d ed. (1956).

10. Common usage of such a term in the context of crime has far from crystallized in the sense that "demonstration" in political context has. E. g., Gang of funmakers; gang of delinquents; that old gang of mine; the gang's all here; railroad gang; come on gang let's be good scouts and whitewash the widow's fence; gang activity; political gang.

in which arguably it could have been used. The instruction in question was as follows:

### From Final Instructions

Before you may find the accused guilty of either or both of these specifications, you must be satisfied beyond a reasonable doubt that the activity organized by the organization known as "Peace" for the 31st of May 1971, in London, England, was in fact a demonstration as this word is used in Air Force Regulation 35–15. In making this determination, you must give no consideration whatsoever to any publication or communication, either official or unofficial, that you might have seen or heard prior to this trial. For the purposes of this trial, you will accept and apply the following definition:

"A demonstration is a public showing or display by a large group of assembled persons of feelings, such as sympathy or antagonism, especially toward a person, a cause or action of public interest. It is a demonstration for a large crowd to intentionally assemble to protest against or indicate favor for some official action or attitude. It can also be defined as a public exhibition of welcome, approval or condemnation; a public manifestation of feeling."

It seems likely that the precise wording of the instruction could have made no practical or reviewable difference in the validity of the conviction; the dictionary definition itself, although its disconnected language might be extended to meetings of a different nature, still must have taken on the gloss of common knowledge and modern usage in the mind of the ordinary person. By the same token the definition itself could mark a sufficiently certain line between demonstrations properly prohibited by the regulation and presentations or meetings to which it legitimately could not apply. Indeed, it is not unreasonable to suppose that the undisputed facts so clearly reveal a "demonstration" in any proper sense as to render any imperfection in definition non-prejudicial, assuming that we were in a position to review the sufficiency of instructions in view of the constitutional implications. But see *Secretary of Navy v. Avrech,* 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 and its sequel *Avrech v. Secretary of Navy,* 171 U.S.App.D.C. 368, 520 F.2d 100 (1975), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2165, 48 L.Ed.2d 793 (1976). See also *Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975).

Be this as it may, it can be firmly concluded that the definition, no matter what our views might be of its technical sufficiency, did not have any determinative bearing upon the appellant's conviction and certainly would not itself justify our invalidation of the result of the court-martial. An examination of the full instructions reveals that following the definition in question the jury was told in effect that it could not convict the defendant if it found that the accused thought it was not a "demonstration", as that term was used in the Air Force regulations, or if they had a reasonable doubt as to whether he thought so or not.[11] In this sense the accused had the

---

11. "Evidence has been introduced tending to show that, both on the 24th and the 31st of May 1971, Captain Culver was under the belief that the activities planned by the Peace organization for London on 31 May 1971, was not a demonstration, as that term is used in Air Force Regulation 35–15. With respect to this evidence, you are advised that even if the court concludes beyond a reasonable doubt that this "presentation" was in fact a demonstration, if the accused was laboring under such a mistake and if his mistake was honest and reasonable, he cannot be found guilty of either offense. In determining the issue of honesty and reasonableness of the accused's alleged mistake, you

should weigh and consider the inherent probability or improbability of the evidence relating thereto. In this regard, you may consider the accused's age, education, experience and background, together with all of the other relevant circumstances.

"The burden is upon the prosecution to establish the accused's guilt by legal and competent evidence beyond a reasonable doubt. Consequently, unless you are satisfied beyond a reasonable doubt that the accused was not honestly and reasonably under the mistaken belief on 24 May 1971, that the aforesaid London incident was not a demonstration, you must acquit him of Charge I and its Specification.

very best of any possible definition—his own.

■ It is not meant to suggest that the military judge's instruction would have saved appellant's conviction if AFR 35–15 had been unconstitutionally vague or overbroad. It was not. *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), does not suggest that any constitutional problem was renewed or created by the instruction. There the validity of the statute in question was upheld as constitutional. The point of the reversal was that the jury should have been instructed that for a finding of "wilfulness" as contemplated by the statute more than a generally had purpose was required. If the trial court in *Screws* in effect had left the interpretation of the term to whatever the defendant had thought it meant, it seems unlikely that the Supreme Court would have reversed on the ground that the instruction was prejudicially erroneous. There are several reasons why we should not attempt to do so in this case—the absence of any possible prejudice, the constitutionality of the regulation itself, and at the very least the clouding of our authority to do so by the collateral nature of the present attack upon a court-martial proceeding governed distinctively by military law.

The judgment of the district court is affirmed.

LEVENTHAL, Circuit Judge, concurring:

I join in Judge Christensen's opinion for the court. This concurring opinion is more an indication of anguish than of disagreement on fundamentals. It also identifies what I regard as the highlights of the case.

We are here asked to review the general court martial of a captain in the Judge Advocate General Corps of the U.S. Air Force. He claims that his conviction for participating in a demonstration in London and for soliciting other military personnel to participate in that demonstration was in violation of his constitutional rights.

1. The initial question for this court is thus the scope of our review on collateral attack of the judgment of a general court martial. Collateral attack on a court martial's judgment is possible where the judgment is void for lack of jurisdiction or for some other fundamental defect. *Schlesinger v. Councilman,* 420 U.S. 738, 747, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975). The Supreme Court has suggested that whether such a judgment may be deemed void may turn on "the nature of the alleged defect, and the gravity of the harm from which relief is sought." 420 U.S. at 753, 95 S.Ct. at 1310. It added that "both factors must be assessed in light of the deference that should be accorded the judgments of the carefully designed military justice system established by Congress". *Id.*

This court has held that a claim of violation of constitutional right will permit the federal courts to make inquiry into court martial convictions. *Kauffman v. Secretary of the Air Force,* 135 U.S.App.D.C. 1, 415 F.2d 991 (1969). We have also recognized the special role played by the Court of Military Appeals, a court of civilians which has "indicated its readiness to apply to men in the military service the protection of pertinent Supreme Court decisions based on constitutional grounds." *Levy v. Corcoran,* 128 U.S.App.D.C. 388, 390, 389 F.2d 929, 931 (1967), *cert. denied,* 389 U.S. 960, 88 S.Ct. 337, 19 L.Ed.2d 369 (1967). Thus in *Levy v. Corcoran,* this court refrained from interfering to prevent a court martial partially on the grounds that the constitutional claims raised by the petitioner could be presented to the general court martial and in due course to the Court of Military Appeals.

In this case, however, the petitioner was not able to obtain review by the Court of Military Appeals. Indeed, his sentence was not sufficiently severe to entitle him to an

Unless you are satisfied beyond a reasonable doubt that the accused was not honestly and reasonably under the mistaken belief on 31

May 1971, that the aforesaid London incident was not a demonstration, you must acquit him of Charge II and its Specification."

automatic appeal to the Air Force Court of Military Review, and the Judge Advocate General refused to acquiesce in a discretionary appeal. Since appellant's constitutional claims were thus not reviewed by any appellate court, either military or civilian, I feel free to approach them almost as though I were a member of the Court of Military Appeals undertaking direct review.

2. Appellant contends that AFR 35–15, ¶ 3e(3)(b), which prohibits military personnel from participating in demonstrations in foreign countries, is void for vagueness, overbreadth, and violation of his inalienable rights. I believe, however, that the term "demonstration" gave adequate notice to appellant that his activity was prohibited. The essence of "demonstration" is the overt display to the public of "demonstrative" expression or activity. *See United States v. Alexander,* 47 C.M.R. 786 (CMA) (1973), *quoting United States v. Bradley,* 418 F.2d 688, 690 (4th Cir. 1969). This fairly characterized the activities of the group that appellant joined and urged others to join. While their assemblage may have lacked some of the more obtrusive characteristics of some demonstrations—placards, buttons, marches, etc.—the essential purpose of assembling a large group of people was to attract the attention of the public to their manifestation of opposition to the war.

Moreover, to the extent that there was any ambiguity in the regulation, instructions given to the court martial—requiring acquittal in the event that appellant honestly and reasonably believed that the London incident was not a demonstration—insured that appellant was fairly convicted. While the instruction did not dispose of all consti-

tutional issues, it removed any taint of unfairness to appellant as an individual.[1]

Lastly, insofar as appellant's challenge to the vagueness of the regulation rests on its potential unfairness to others, his contentions are expressly foreclosed by *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

3. Appellant also attacks the Air Force regulation as overbroad. He claims that it is defective in that it prohibits even those demonstrations which do not endanger U.S. relations with the host country.

In analyzing this contention, I am constrained to begin with the premise that men and women serving in the military have less freedom to engage in political activity than other citizens. It is unfortunate that those who serve their country are required to make this additional sacrifice, but the Supreme Court has recognized that the special mission and structure of the armed forces may require restrictions unacceptable elsewhere in society. *Parker v. Levy,* 417 U.S. 733, 758, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). Indeed, the need for a military which is and appears to be politically neutral has been held to justify restrictions on the political activities of even ordinary citizens when they take place on domestic military bases. *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976).

In this case the stationing of American troops on foreign soil creates a special need for political neutrality. The presence of our troops in a foreign land inevitably creates a political issue for the host government—whether its military and political alliance with the United States is advantageous. Political demonstrations by Ameri-

---

[1] A misunderstanding pervades Chief Judge Bazelon's articulation of what he describes as an "unarticulated extension" of reference to the instruction. What my opinion is meant to convey is that the regulation is sufficient, to give adequate notice to appellant by the test of ordinary, common sense understanding. And if by any chance appellant lacks such ordinary understanding, even if his "infirmity" is only the product of steepage in some federal appellate opinions—then he had extra protection in the instruction, giving him a safeguard beyond that required by the Constitution.

In reaching its verdict, the court was not limited to the clarificatory statement issued by appellant's superior, but could have considered all the facts and circumstances concerning his actions, including the language of the regulation, appellant's training and background and his course of conduct. There was evidence to support the determination negativing any defense of honest and reasonable belief that the London incident was not a demonstration.

can servicemen may have an impact on this issue. Because American troops are both the symbols and instruments of American foreign policy, their actions are more likely to have a significant impact than those of individual visitors like tourists and businessmen. Thus, as our treaty with Great Britain recognized,[2] there is a need for American troops abroad to refrain from political demonstrations.

Under these circumstances, application of familiar doctrines of overbreadth does not seem appropriate. Overbreadth doctrine permits one individual to champion the First Amendment rights of others so that a broad social interest in uninhibited expression might be furthered. *Gooding v. Wilson*, 405 U.S. 518, 521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). But in the military community, and especially when American troops are stationed abroad, the interest in political expression must yield to other needs. *Cf. Parker v. Levy*, 417 U.S. 733, 758–59, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

4. In any event, the breadth of the regulation attacked here is constitutionally justified. Politics are always complex and unpredictable; the nuances of foreign politics may be particularly difficult for Americans to understand or predict. The effect of an incident on our relations with a host country may depend on matters of attitude within a foreign government that simply cannot be adduced in a court martial.[3] Individual servicemen cannot demand the right to predict or determine which demonstrations will prove disruptive or embarrassing in our relations with the host country. There is constitutional justification for a broad ban on off-base demonstrations by our troops abroad.

5. I turn last to appellant's contention that he was engaged in presenting a petition to our Ambassador in London for forwarding to Washington and that his activity therefore deserves special constitutional protection. There is evidence in the record that the demonstration was originally scheduled to take place at the American Embassy, in London, and that the site of assemblage was changed to Speakers' Corner in Hyde Park at the request of an official of Scotland Yard. But the record also reveals that the event was from the start projected as "a large assembly" and that it was the size of the assembly which, in the interest of public order, required the modification of plans. A petition could have been presented without the eye-catch-

---

2. [1951] 4 U.S.T. 1792, T.I.A.S. No. 2846, art. II, provides in pertinent part:

It is the duty of a force and its civilian component and the members thereof as well as their dependents to respect the law of the receiving States and to abstain from any activities inconsistent with the spirit of the present Agreement, and, in particular, from any political activity in the receiving state. It is also the duty of the sending state to take necessary measures to that end. [1951] 4 U.S.T. at 1796.

The Treaty prohibits "any political activity *in the receiving state*." In my view, actions taken on our bases or within our embassy grounds are not "in the receiving state". Hence, I do not find the language of the Treaty to be as problematic as the dissent asserts.

To agree that the Treaty was not intended to prohibit American servicemen from voting or engaging in political discussions in the host country is not to concede the construction advanced in the dissent. What the Treaty seems to contemplate is the kind of prophylactic ban on political "demonstration" which the Air Force adopted, a ban that operates on inherently conspicuous and attention-getting activity.

3. The dissent says at —— of 182 U.S.App.D.C., at 639 of 559 F.2d that "[i]f a foreign government is so displeased by a demonstration that our relations with it are harmed, surely it would be willing to send a spokesman to testify to this effect." Arrangements with foreign governments are often intended to avoid prickles of embarrassment. It may be embarrassing in the extreme to have to testify concerning embarrassment—to one's self, to others, to host, to guest.

This goes beyond mere punctilio. The negotiation of such treaties must respect the full interests of foreign governments who are asked to host foreign forces on their soil. Moreover, this is a multi-lateral NATO treaty, signed not only by the United States and Great Britain, but also by Belgium, Canada, Denmark, France, Iceland, Italy, Luxembourg, Netherlands, Norway and Portugal. This factor supports the general construction of restraint used by the armed services even assuming there may be room for relaxation depending on the country of the residence of armed forces.

ing assembly. Moreover, it was in aid of the effort to increase the size of the assembly that appellant passed out leaflets during the preceding week. Hence I must find that appellant is not entitled to the same protection as one who simply presented a petition to the Ambassador.

\*　　\*　　\*　　\*　　\*　　\*

A judge does not, at least this judge does not, relish limiting the rights of others. But sometimes this has to be done. On previous occasions the Supreme Court has held that the rights of servicemen and women may be curtailed in order to achieve legitimate military objectives. Here the military may have been rigid in some details, but at this remove the domestic courts cannot sensibly second guess the military's response abroad so long as it was basically responding to considerations rooted in reasoned policy, rather than capriciousness. In the case at hand, military justice may have been taut but it was rational. The Federal courts have been instructed by the Supreme Court to let such judgments stand.

BAZELON, Chief Judge, dissenting:

The majority upholds appellant's conviction for participating in a demonstration in a foreign country and for soliciting other military personnel to do the same. There can be no objection to most of my colleagues' observations about the needs of the military and our responsibilities to nations that host our troops. It is at the point that they apply these generalities to the facts of this case that we part ways. Their response to appellant's vagueness claim raises troubling questions of fairness and logic, but their rejection of his overbreadth claim is even more disturbing because it needlessly shrinks the substantive reach of the first amendment. Finding no evidence in the record that the government's concededly substantial interests require this particular curtailment of a citizen's first amendment rights, I dissent.

## I. VAGUENESS

" 'Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.' " *Parker v. Levy,* 417 U.S. 733, 757, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974). Appellant argues that AFR 35–15's prohibition on "demonstrations" is too imprecise to give the requisite notice. He notes that the term "demonstration" is not defined in the regulation, it carried no judicial gloss at the time of his acts in 1971, and it is open to numerous interpretations in everyday parlance. For these reasons, appellant would have us hold the regulation violative of due process by analogy to *Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1972) ("treats contemptuously the flag of the United States" held vague); *Coates v. Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) ("conduct . . . annoying to persons passing by" held vague); *Lanzetta v. New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939) ("gang" held vague).

Judge Christensen answers appellant's argument briefly:

There is a kind of gloss to the term 'demonstration' as used in the regulation from the context of 'protest and dissent' in which it appears, by the treaty obligation, the duties of visiting military personnel and their organizations which are quite separate from such political activity, and by the very meaning with which the word has come to be used. In the latter connection there seems no valid comparison between the word 'demonstration' and the other words which as appellant points out have been held to involve, in various contexts, impermissible vagueness, including 'gang'.

At —— of 182 U.S.App.D.C., at 628 of 559 F.2d.

There is indeed a "kind of gloss to the term 'demonstration' " based on its context and everyday usage, but that gloss blurs into vagueness precisely in the area of appellant's activity. I assume that "demonstration" would not describe individual presentations of petitions to the ambassador, just as I assume that it would describe mass gatherings with all the usual trappings of

political protests. Appellant's activity fell somewhere in between these extremes. Although appellant could have speculated that his conduct might be proscribed, the regulation hardly provided him clear notice that his particular style of protest would constitute criminal activity. That the military court and the district court each applied different definitions, and that both of these definitions differ from that later relied on by the Court of Military Appeals in *United States v. Alexander,* 22 USCMA 485, 47 CMR 786 (1973), confirm that the line dividing illicit demonstrations from similar (but not illicit) activities is fuzzy at best.

Both Judges Christensen and Leventhal refer to a portion of the military judge's instructions to bolster their conclusion that no unfairness resulted from any ambiguity in the regulation. With no apparent thought about appellant's vagueness claim, the trial judge instructed the jury as to appellant's defense of mistake in fact. In order to convict appellant, the military jurors were required to find that he was not laboring under "an honest and reasonable mistake" as to whether his presentation of petitions was a "demonstration" within the meaning of AFR 35–15. Rec. 499.

My colleagues deny any suggestion that this instruction could cure vagueness if it existed, a disclaimer with which I emphatically agree. Vagueness is an objective issue to be judged on the face of the regulation and its authoritative gloss; it cannot be negated by a showing of the defendant's subjective state of mind.[1] If the law were otherwise, trial judges could foreclose a vagueness claim on appeal simply by instructing juries that, to convict, they must find that the defendant did not mistakenly believe that his conduct fell outside the relevant legal proscription. Questions of constitutional law that should be decided by the court would thereby be converted into questions of fact for the jury and be effectively insulated from appellate review. Moreover, a defendant could be convicted for violating a constitutionally defective statute on the ground that he happened to be unaware of its defect.

Given my colleagues' concession that appellant's actual knowledge is irrelevant to the issue of vagueness, I am puzzled by their reference to the judge's instruction. Having concluded that the regulation is not vague, they evidently rely on the jury's conviction of appellant in the face of that instruction to assure themselves that Culver at any rate knew he was inviting prosecution by his conduct. The unarticulated extension of this conclusion is that he now is raising a purely technical objection by arguing on appeal that the regulation was, by an objective standard, too vague to have given him the notice required by due process.[2] Unfortunately, this conclusion about

1. In *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), the defendant had been convicted under 18 U.S.C. § 20 for depriving a prisoner of a right protected by the Constitution, the right not to be deprived of life without due process of law. On appeal, the defendant argued that the statute was unconstitutionally vague because its incorporation of due process, a broad and changing concept, provided no ascertainable standard of guilt. To save the statute, the Court construed it to require "a specific intent to deprive a person of a federal right made definite by decision or other rule of law." 325 U.S. at 103, 65 S.Ct. at 1036. "The fact that the defendants may not have been thinking in constitutional terms is not material where their aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution." *Id.* at 106, 65 S.Ct. at 1037. The Court added: "Of course, *willful conduct cannot make defi-*

*nite that which is undefined.* But willful violators of constitutional requirements, *which have been defined,* certainly are in no position to say that they had no adequate advance notice that they would be visited with punishment. When they act willfully in the sense in which we see the word, they act in open defiance or in reckless disregard of a constitutional requirement *which has been made specific and definite.* When they are convicted for so acting, they are not punished for violating an unknowable something." *Id.* at 105, 65 S.Ct. at 1037. (emphasis added).

2. Judge Leventhal states: "While the instruction did not dispose of all constitutional issues, it removed any taint of unfairness to appellant as an individual." At —— of 182 U.S.App. D.C., at 631 of 559 F.2d.

the state of Culver's knowledge is as factually unfounded as it is legally irrelevant.[3]

## II.  OVERBREADTH

Appellant's "overbreadth" claim is perhaps misnamed. He does not contend that AFR 35–15 is unconstitutional because it facially reaches *others'* clearly protected activity;[4] indeed, in light of the restriction on standing announced in *Parker v. Levy,* 417 U.S. 733, 758–60, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), he could not do so. Rather, appellant claims that the regulation is unconstitutional as applied to his own protest activities.[5]

In rejecting this claim, my colleagues seem to argue on two levels—first, that the Constitution permits the Government broadly to prohibit *all* demonstrations by foreign-based military personnel, regardless of the particular factual setting; and second, that the facts of this case show a compelling justification for proscribing this defendant's protest. I find no legal basis in the case law for the majority's first proposition, and no factual basis in the record for their second.

### A.  The Broad, Flat Ban of AFR 35–15 is Unconstitutional

To my knowledge, no Supreme Court case has upheld a broad curtailment of first amendment rights comparable to that worked by AFR 35–15. Its ban on demonstrations is absolute; it requires no individual determination that a given protest will affect a substantial government interest. Both of my colleagues' opinions contain statements sanctioning the flat proscription of AFR 35–15. These warrant close examination.

The appellant argues that AFR 35–15 should be interpreted to ban demonstrations only when they have been found to threaten our relations with a country hosting our

---

**3.** The prosecution refuted appellant's mistake of fact defense by putting into evidence a statement (Prosecution exhibit 13) prepared by appellant's immediate superior, Major Franklin P. Flatten, Staff Judge Advocate, 48th Combat Support Group. This document stated in part: "Unofficial publications have recently offered opinions as to the legality of certain protest and dissent activities. Those opinions are incorrect . . . All personnel are advised that paragraph 3e(3) of AFR 35–15, Dissent and Protest Activities, specifically prohibits participation by military personnel in any demonstration in a foreign country. The prohibition applies whether the serviceman or servicewoman is on or off base, in or out of uniform, on or off duty. It also applies in full force irrespective of what term or name is given to the demonstration." The timing of this document indicates that it was directed specifically at appellant's planned presentation; I assume that appellant must have so interpreted it.

This statement was presented to appellant on May 26, *i. e., after* he had committed the acts of May 24 underlying Charge I. Thus, it came too late to give appellant notice, hardly apparent from a facial reading of AFR 35–35, that his distribution of leaflets constituted soliciting other Air Force personnel to violate a lawful regulation.

As for Charge II, the statement would have put appellant on notice that AFR 35–15 prohibited his planned presentation on May 31 *only if* (1) interpretations of regulations by the source that issued this statement carried the force of law, *and* (2) the statement on its face issued

from this source. The first question was not argued at trial or in the briefs to this court. The second question was raised at trial (while the jury was out) but was left unresolved. Rec. 473–75.

In accordance with the trial judge's instructions, the jury also could have surmised that appellant knew that his activities would constitute a "demonstration" banned by AFR 35–15 because of his "age, education, experience and background"—*i. e.,* because he was a lawyer. I fail to see how appellant's legal training proves that he knew "demonstration" encompassed his presentation of petitions. If I had been in appellant's shoes, I too might have concluded that the military could not constitutionally have proscribed, and therefore would not have intended its regulation to reach, this kind of activity.

Hence, there was little evidence to support the implicit finding that appellant must have known his conduct was proscribed by AFR 35–15.

**4.** *See* G. Gunther, Cases and Materials on Constitutional Law 1132–42 (1975).

**5.** We may assume, for purposes of discussing this claim, that appellant's presentation of petitions fell squarely within AFR 35–15's proscription. Thus, the issue is not whether the regulation was properly applied to his protest, but whether the regulation as applied to it was constitutional.

troops or to endanger some other important government interest, either because of the style of the protest or because of the political issue involved. In response, Judge Christensen states:

> The appellant reads altogether too narrowly the interest of the military in complying with the treaty obligation of the United States to avoid intervention in political affairs through its military forces. [ ] It would be unseemly and possibly disruptive—or at least the military had the right to consider it so—for members of the military to engage in demonstrations in the host country no matter what political interest was being pressed.

At ——— of 182 U.S.App.D.C., at 628 of 559 F.2d. Similarly, Judge Leventhal states:

> In this case the stationing of American troops on foreign soil creates a special need for political neutrality. The presence of our troops in a foreign land inevitably creates a political issue for the host government—whether its military and political alliance with the United States is advantageous. Political demonstrations by American servicemen *may* have an impact on this issue. Because American troops are both the symbols and instruments of American foreign policy, their actions are *more likely* to have a significant impact than those of individual visitors like tourists and businessmen. Thus, as our treaty with Great Britain recognized, [ ] there is need for American troops abroad to refrain from political demonstrations.

At ——— of 182 U.S.App.D.C., at 631–632 of 559 F.2d (emphasis added).

With my colleagues' premises, I wholeheartedly agree. It is their conclusions I reject. Judge Christensen fails to explain why the government interest in avoiding "unseemly and possibly disruptive" demonstrations justifies an absolute prohibition "no matter what political interest was being pressed" and, we may assume, no matter how orderly and lawful the protest. Putting aside for the moment whether an absolute ban on all demonstrations is required by treaty,[6] I cannot believe that all protests by servicemen abroad will be unseemly and disruptive; if aimed solely at domestic American issues and conducted in accordance with local law, such demonstrations may carry little or no impact locally. Nor can I believe—as Judge Leventhal appears to—that the risk that some demonstrations might harm our foreign relations is so likely to occur or would be so devastating in its consequences if it did occur that it justifies a precautionary ban on all demonstrations without inquiry into individual circumstances.[7]

Perhaps the real rationale for Judge Christensen's conclusion lies in the line—"at least the military had the right to consider it so."[8] I read this statement as expressing familiar judicial deference to military judgments. However tempting it may be to

---

6. *See infra* at ——–——— of 182 U.S.App.D.C., at 640–641 of 559 F.2d. Even assuming that AFR 35–15 is mandated by the Status of Forces treaty, the Constitution is superior law, though I am mindful that a clear treaty obligation would weigh heavily in any first amendment balance.

7. *Compare Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), in which the Supreme Court upheld a military regulation ordering the exclusion from the West Coast of those residents of Japanese ancestry. Stating that "[n]othing short of apprehension by the proper military authorities of the gravest imminent danger to the public safety can constitutionally justify [this sort of discriminatory deprivation]," *id.* at 218, 65 S.Ct. at 195, the Court upheld the order only because it "could not reject the finding of the military authorities that it was impossible to bring about an immediate segregation of the disloyal from the loyal," *id.* at 219, 65 S.Ct. at 195. In other words, the Court sacrificed the principle of individualized determinations and sustained a broad deprivation of fundamental constitutional rights because it found the gravity of the danger so great, the likelihood of the harm so substantial, and the availability of alternatives nonexistent. Even so, the majority opinion evoked stinging dissents and has continued to be criticized to this day.

8. Judge Christensen also states: "The military had wide latitude in defining and implementing the military interest and necessity in these respects." At ——— of 182 U.S.App.D.C., at 628 of 559 F.2d.

leave military matters to military authorities, first amendment challenges to military regulations merit the same careful scrutiny accorded civilian regulations. For example, in *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), the Court upheld a ban against on-base campaigning only after thorough analysis revealed that it had satisfied the "heavy burden of justification" that "any significant restriction of First Amendment freedoms carries." *Id.* at 843, 96 S.Ct. at 1220. (Powell, J., concurring). It is true that *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), contains extensive discussion of the differences between civilian and military law. But the purpose of that discourse is to explain why more restrictive standing principles for facial overbreadth[9] and vagueness[10] should govern challenges to military regulations, and to support a slight loosening of the substantive standard for vagueness claims.[11] *Parker* does not hold that those considerations warrant a generally laxer or more deferential standard of review.[12]

Judge Leventhal's opinion suggests yet another reason for upholding the broad prohibition of AFR 35–15:

Politics are always complex and unpredictable; the nuances of foreign politics may be particularly difficult for Americans to understand or predict. The effect of an incident on our relations with a host country may depend on matters of attitude within a foreign government that simply cannot be adduced in a court martial. Individual servicemen cannot demand the right to predict or determine which demonstrations will prove disruptive or embarrassing in our relations with the host country. There is a constitutional justification for a broad ban on off-base demonstrations by our troops abroad.

At —————— of 182 U.S.App.D.C., at 630–631 of 559 F.2d. Judge Leventhal's point is substantial, but not, I think, persuasive. Of course, a broad rule without conditions or exceptions is more easily applied than one requiring individualized determinations. It also guarantees that none of the feared harms will ever come to pass. But the first amendment protects higher values than convenience and freedom from risk.[13] Even when the Government has

9. *See* 417 U.S. at 758–60, 94 S.Ct. 2547.

10. *See id.* at 756, 94 S.Ct. 2547.

11. *See id.* at 756–57, 94 S.Ct. 2547.

12. Arguably, there is a distinction to be drawn between challenges to military regulations brought initially in federal court requiring normal review (*e. g., Greer v. Spock, supra*) and challenges made by way of collateral attack on military court convictions requiring more limited, deferential review (*e. g., Parker v. Levy, supra,* and *Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975)). This distinction would rest on "the deference that should be accorded the judgments of the carefully designed military justice system established by Congress." *Schlesinger v. Councilman,* 420 U.S. at 753, 95 S.Ct. at 1310, *see also id.* at 758, 95 S.Ct. 1300. The degree of deference that should be paid to a military court's judgment, however, must logically turn on the extent to which the "military decision has dealt fully and fairly with an allegation raised" in that system of courts. *Burns v. Wilson,* 346 U.S. 137, 142, 73 S.Ct. 1045, 1049, 97 L.Ed. 1508 (1953). In the present case, only the military trial judge passed on appellant's constitutional claims. See Judge Leventhal's

statement, at —————— of 182 U.S.App.D.C., at 632 of 559 F.2d. Thus, there is no basis here for anything less than the searching review normally accorded first amendment challenges.

13. In a case contesting whether school officials could prevent students from wearing armbands as an antiwar protest, the Court found that the mere risk of disturbance did not justify this prohibition of expression. "[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." The Court held that the prohibition of this form of expression, "at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." *Tinker v. Des Moines School District,* 393 U.S. 503, 508, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969).

Similarly, in the prosecution of a defendant for wearing a jacket displaying the words "Fuck the Draft," the state court had upheld the offensive conduct statute and conviction on the ground that "such conduct might cause others to rise up to commit a violent act against the person of the defendant or attempt

prohibited speech to prevent subversion or insurrection, the Supreme Court has demanded an individualized inquiry into whether the particular defendant's acts and words truly threatened the nation's security.[14]

Never was there an individualized determination by the military command or military court that appellant's protest infringed military interests. The ban on demonstrations was a flat one; the notice given appellant by his superiors merely interpreted that ban to apply to his already planned protest. Similarly, the military trial judge ruled that the broad ban of AFR 35-15 was constitutional without himself determining, or requiring the jury to find, the appellant's protest affected any government interest in any fashion whatsoever.

I see no threat to any national interest in requiring servicemen to secure the permission of their commanders before engaging in public demonstrations abroad, and in requiring those commanders to justify their refusal to give permission with specific rea-

---

to forceably remove his jacket." The Supreme Court replied:

> The rationale of the California court is plainly untenable. At most it reflects an 'undifferentiated fear or apprehension of disturbance [which] is not enough to overcome the right to freedom of expression.' . . . We have been shown no evidence that substantial numbers of citizens are standing ready to strike out physically at whoever may assault their sensibilities with execrations like that uttered by Cohen. There may be some persons about with such lawless and violent proclivities, but that is an insufficient base upon which to erect, consistently with constitutional values, a governmental power to force persons who wish to ventilate their dissident views into avoiding particular forms of expression.

*Cohen v. California,* 403 U.S. 15, 17, 23, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971).

**14.** A long line of Supreme Court cases dealing with subversive speech has established this principle. Beginning with *Schenck v. United States,* 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919), the Court held that "[t]he question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." *Id.* at 52, 39 S.Ct. at 249.

Subsequently, the Court was presented with statutes in which the legislature had itself weighed the danger, concluding that "to knowingly be or become a member of or assist in organizing an association to advocate, teach or aid and abet the commission of crimes or unlawful acts of force, violence or terrorism . . involves such danger to the public peace and the security of the State, that these acts should be penalized. . . . " *Whitney v. California,* 274 U.S. 357, 371, 47 S.Ct. 641, 647, 71 L.Ed. 1095 (1927), *overruled by Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

Initially, the Court deferred to the legislature's judgment that mere membership in these organizations so endangered the state as to stand outside the first amendment. No inquiry was made whether the individual defendant's own acts and speech threatened the government. In response, Justice Brandeis attacked the Court's failure to examine for itself the question of clear and present danger as raised by the facts of the case before it:

> Whenever the fundamental rights of free speech and assembly are alleged to have been invaded, it must remain open to a defendant to present the issue whether there actually did exist at the time a clear danger; whether the danger, if any, was imminent; and whether the evil apprehended was one so substantial as to justify the stringent restriction interposed by the legislature. The legislative declaration, like the fact that the statute was passed and was sustained by the highest court of the State, creates merely a rebuttable presumption that these conditions have been satisfied.

*Id.* at 378–79, 47 S.Ct. at 649 (concurring).

Justice Brandeis' position eventually prevailed. In the Smith Act prosecutions of the early 1960's, the Court construed the membership clause of the Act to require "clear proof that a defendant 'specifically intend[s] to accomplish [the subversive aims of the organization] by resort to violence" and that he have the "specific intent 'to bring about the overthrow of the government as speedily as circumstances would permit.' " *Scales v. United States,* 367 U.S. 203, 229–30, 81 S.Ct. 1469, 1486, 6 L.Ed.2d 782 (1961). In other words, Justice Harlan suggested that it is not enough that Congress finds the Communist Party so threatening to the national security that mere knowing membership can be constitutionally punished. The crime must also include the element of individual intent to bring about those evils that justify controls on the Party itself. Thus, to avoid constitutional conflict, the Court required an individualized determination that an important government interest— there, prevention of incitement to unlawful conduct—was threatened by that defendant's words or deeds.

sons. Like many cities' parade permit ordinances, this scheme would allow for prospective adjudications when disputes arose.[15] Similarly, I see no threat to national interests in requiring the Government, in its criminal prosecutions for violations of AFR 35–15 and related regulations, to prove that the defendant's protest activity in fact affected an important government interest, such as maintaining amicable relations with countries hosting our troops. I do not agree with Judge Leventhal that "matters of attitude within a foreign government . . . simply cannot be adduced in a court martial." If a foreign government is so displeased by a demonstration that our relations with it are harmed, surely it would be willing to send a spokesman to testify to this effect. Or where that is not feasible, surely our government can offer evidence to substantiate its claim that the demonstration is harmful, if in fact it is.

In showing future risk or past harm to an *important* government interest, the prosecution's burden of proof need not be heavy. For example, any demonstration significantly affecting our relations with a host country should be proscribable. Whether that foreign country was reasonably justified in taking offense would not be at issue; the Government would have to prove only that a significant effect on our relations would probably occur or had already occurred because of a particular demonstration.[16]

It is vital to remember that we are discussing only *this* country's restrictions on what its servicemen do while abroad. The first amendment does not keep host countries from proscribing demonstrations by visiting U.S. troops any more than it does by their own citizens. Moreover, if American servicemen violated such local laws they would properly be subject to discipline by U.S. military authorities within the terms of our treaties with that nation. The situation addressed by the present case is quite different, however, for here the local English authorities made no apparent attempt to constrain appellant's activities apart from traffic and police considerations. Given the power of local government to control public protests and given the power of U.S. military authorities to punish their troops for violations of local law, I see no justification for the broad, absolute prohibition of AFR 35–15 as construed and upheld by the majority. Military authorities doubtlessly need power to proscribe demonstrations even when local law is not violated, but I would require that the exercise of that power be more tightly tied to some substantiated and substantial government interest.

**B. Insufficient Justification Has Been Shown for Proscribing Appellant's Speech**

Once it is agreed that AFR 35–15 should be construed to require an individualized showing of detriment to some important government interest, the issue becomes one of mixed fact and law—does the record show that appellant's words or deeds so harmed a valid military interest as to lose their constitutional protection? The majority seems to answer this question as an alternative ground to its broader holding,

---

**15.** *See* G. Gunther, Cases and Materials on Constitutional Law, 1175–76, 1204–06 (1975). *See also Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) (prior restraints on films); *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957) (prior restraints on books).

**16.** Lesser governmental interests than maintenance of amicable relations with host countries may require a stronger showing of probability or harmful effect before speech may be proscribed. *Cf. Dennis v. United States,* 341 U.S. 494, 510, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), *quoting United States v. Dennis,* 2 Cir., 183 F.2d 201, 212 (Hand, Ch. J.): " 'In each case [courts] must ask whether the gravity of the "evil," discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.' " Although this flexible standard has been undercut in subversive speech cases by *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), it remains useful in cases where the regulation is less content-oriented, and therefore requires less searching review than mandated by the stringent "clear and present danger" test of *Brandenburg.*

finding compelling justification for proscribing appellant's protest on the facts of this case. Again I disagree.

The Government had advanced several military interests said to justify this infringement of appellant's first amendment rights.[17] The district court relied on the first of these—"good order, discipline, and morale." This admittedly substantial government interest, *see Parker v. Levy,* 417 U.S. at 758, 94 S.Ct. 2547, was found by this court to justify a military regulation curtailing the time, place and manner that first amendment rights could be exercised in *Carlson v. Schlesinger,* 167 U.S.App.D.C. 325, 511 F.2d 1327 (1975). However, that case involved the solicitation of signatures for an antiwar petition on a military base in a Vietnam combat zone. Whatever the danger to discipline and morale caused by that act in that setting,[18] I cannot see how the much lesser danger presented by appellant's behavior justifies the even more drastic curtailment of speech caused by a flat ban on all demonstrations. The conviction here was for activity occurring off base in a

country at peace. The Government has offered no explanation for how discipline or morale could have been significantly harmed by the mere presentation of petitions to the ambassador under these circumstances, nor do I see how the Government could do so short of arguing that the military should be empowered to stifle all dissident communications in the interests of maintaining servicemen's unquestioning adherence to official policies.

My two colleagues rely on the second government interest advanced by appellees —"maintaining amicable relations with foreign countries." Appellee's Br. at 35. The prohibition on demonstrations is said to be grounded on more than a diplomatic desire to avoid the appearance of our meddling in other nations' affairs; it also springs from treaty agreements with countries hosting United States military personnel.[19] Article II of the treaty provides:

It is the duty of a force and its civilian component and the members thereof as well as their dependents to respect the

---

**17.** In *United States v. Alexander,* 22 USCMA 485, 47 CMR 786 (1973), the Court of Military Appeals described the purpose of Army Regulation 60020, which proscribes foreign demonstrations in language identical to AFR 35–15: "the regulation's purpose was to establish military neutrality in connection with causes 'for which the demonstration is conducted.'" The court equated this purpose with the traditional American aversion to "a man on a white horse" and intrusion of the military into the political arena.

This justification is inconsistent with those put forward by the Government in the present case. It should also be noted that the Supreme Court has explicitly stated that the *Alexander* justification cannot support curtailing public speech by off-duty, nonuniformed servicemen while off base in the United States. *See Greer v. Spock,* 424 U.S. 828, 839 (Stewart, J.); 847, 96 S.Ct. 1211, 1222, 47 L.Ed.2d 505 (Powell, J., concurring) ("Nor could there be any prohibition on handing out leaflets and holding campaign rallies outside the limits of the base."). If the government's interest in keeping the military out of United States politics will not support a ban on all demonstrations by servicemen stationed in the United States, that same interest can hardly support a flat ban abroad.

**18.** The court in *Carlson* (from which I dissented) did not specify how the collection of signatures on petitions endangered discipline and

morale, except to suggest that other servicemen might have objected violently to the views expressed in the petitions. The court's standard was unquestioningly deferential: "Because judges are ill-equipped to second guess command decisions made under the difficult circumstances of maintaining morale and discipline *in a combat zone,* . . . we should not upset such determinations unless the military's infringement upon first amendment rights is *manifestly unrelated to legitimate military interests."* 511 F.2d at 1333 (emphasis added). This very lax standard of review is disturbing enough in a combat situation. *Cf. Korematsu v. United States,* 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (even during a military emergency, racial classifications must be subjected "to the most rigid scrutiny"). I do not believe that the Constitution allows the extension of such a deferential standard of review to less exigent settings.

**19.** At trial, the Prosecution stated: "The Government does not contend that AFR 35–15 was written with a view toward enforcing Article II [of the North Atlantic Treaty Organization, Status of Forces Agreement]; we submit, however, that it does provide a method for the Department of Defense to enforce within its system of justice, violation of that Article of that NATO/SOFA Agreement." Rec. 19.

law of the receiving States and to abstain from any activities inconsistent with the spirit of the present Agreement, and, in particular, from any political activity in the receiving state.

[1951] 4 U.S.T. 1792, T.I.A.S. No. 2846, art. II.

Although the question is one of first impression for which there is no legislative history, I believe that "any political activity" cannot be read literally. Very serious first amendment problems would be raised if the provision were construed to preclude American servicemen from engaging in activity such as voting and political discussions. Once it is conceded that *all* political activities are not banned by the treaty, how should the provision be construed? Its context in the treaty, as well as common sense, dictates that it should be interpreted consistently with the purpose of avoiding interference with local politics and offense to local governments. The applicability of AFR 35–15—if we assume this regulation's purpose is to enforce the treaty—would thus turn on questions of fact particular to each case—would or did this demonstration interfere with local politics or offend local government?

In appellant's case, the majority answers this question briefly:

The Vietnam question, especially with respect to participation in the war, was highly political, no matter where dis-

cussed, and even the emotional impact of that political question as it involved the United States was not any the less political because it was dealt with and exploited in a friendly foreign country.

At —— of 182 U.S.App.D.C., at. 628 of 559 F.2d. Judge Christensen relies on speculation and generalities. He cannot point to evidence in the record demonstrating that appellant's protest embarrassed or offended the English because the record is devoid of such evidence. In fact, the scant testimony on this point all is to the effect that few British citizens noticed the protest at all, and of those who did, none disapproved. The Constitution surely requires more solid basis than this for prosecuting an American serviceman for publicly declaring his opposition to his government's participation in an unpopular war.[20]

## III.  CONCLUSION

The essence of my disagreement with my colleagues is simple. Recognizing that demonstrations by servicemen stationed abroad may cause substantial problems for the government, they have decided to give military authorities broad license to ban all demonstrations.[21] Mindful of the risks involved, I agree that the speech rights of soldiers must give way when substantial government interests would otherwise be harmed. What I cannot accept—and do not

---

20. *Cf. Cohen v. California,* 403 U.S. 15, 23, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (Court notes lack of evidence to support State court's speculative justification for offensive conduct statute and conviction); *Stanley v. Georgia,* 394 U.S. 557, 567, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (speculative connection between exposure to obscenity and deviant sexual behavior cannot justify prohibition of possession of obscene materials); *Tinker v. Des Moines School District,* 393 U.S. 503, 508–09, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (Court notes lack of evidence to support lower court's speculations about risk of disorder arising from students' wearing of armbands); *Scales v. United States,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961) (Evidentiary requirements for Smith Act prosecutions).

21. I trust that my colleagues would take a dimmer view of a prosecution under AFR 35–15 if it were shown that the military failed to

ban all "demonstrations," but instead discriminated among them on the basis of their message. *See Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) ("[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."). While the "equal protection" aspect of the first amendment is indisputably crucial as a bulwark against censorship, an equally vital facet of free speech is that of effective access to an audience. *See* G. Gunther, Cases and Materials on Constitutional Law 1142–1259 (1975); Note, *The Public Forum: Minimum Access, Equal Access, and the First Amendment,* 28 Stan.L.Rev. 117 (1975). From the denial of such access inevitably flow the frustration, alienation, apathy, helplessness, and violence of the voiceless and unheard.

believe that the Constitution permits—is the sweeping proscription of AFR 35–15, applicable to all public protests alike regardless of their actual or probable impact. The values shielded by the first amendment are not immune to trade-offs with competing governmental interests, but where a trade-off is required, I would give up as little of the first amendment as possible, and resolve all doubts in favor of free speech. The majority, I believe, not only resolves its doubts in favor of other values, but also gives up far more of the first amendment than any government interest requires.